579 A.2d 1191

**Marlene Cohen KENNEDY, et al.**

v.

**MOBAY CORPORATION, et al.**

**No. 1815, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

Sept. 28, 1990.

398

Wendy Fleishman (Fox, Rothschild, O'Brien & Frankel, Philadelphia, Pa., Robert Weltchek, Gebhardt & Smith, Bertram Goldstein and Goldstein, Hood & Associates, Baltimore, on the brief), for appellants.

Willis A. Siefried (Dennis R. McEwen and Eckert, Seamans, Cherin & Mellott on the brief), Pittsburgh, Pa., for appellee, Mobay.

Clifford J. Zatz (Karen L. Meengs, David C. Allen, Ann H. Jameson and Akin, Gump, Strauss, Hauer & Feld on the brief), Washington, D.C., for appellees, W.R. Grace & Co. and E.I. Dupont De Nemours & Co.

Argued before WILNER, ROSALYN B. BELL and CATHELL, JJ.

WILNER, Judge.

Twenty-five employees or former employees of W.L. Gore & Associates (Gore) sued three chemical companies—Mobay Corporation (Mobay), W.R. Grace & Company (Grace), and E.I. DuPont de Nemours & Company, Inc. (DuPont)—which had supplied certain substances to Gore for use in its manufacturing processes, claiming that those substances were hazardous, that the defendants gave inadequate or misleading warnings in how to deal with the substances, and that the plaintiffs suffered personal injuries by reason of exposure to them. Their actions, based on negligence, breach of warranty, and strict liability, were tried before a

jury in the Circuit Court for Cecil County, which returned a defendants' verdict.

The plaintiffs have appealed, raising three principal issues: whether the court's instructions regarding the "sophisticated user" defense were warranted and correct, whether the court erred in allowing the three defendants, collectively, eight peremptory challenges, and whether the plaintiffs were denied due process of law by reason of various continuances granted during the five-month trial. Each of the defendants has filed a defensive cross-appeal, contending that the court erred in rejecting its limitations defense against certain of the plaintiffs and its motion for judgment based on insufficiency of evidence as to other plaintiffs.

## I. GENERAL BACKGROUND

Gore manufactures, among other things, a waterproof fabric known as GoreTex that is used in making raincoats, ski wear, surgical gowns, and a variety of other products. The precise manufacturing process is regarded by Gore as a trade secret, and so we shall describe it only in general terms. It begins with polytetrafluoroethylene, known more commonly by its trade name, Teflon. Robert Gore, the company founder's son, devised a way to stretch a Teflon membrane in such manner as to create microscopic holes in it. In that condition, the membrane allows water vapor to escape through it but remains impervious to water droplets; in other words, it "breathes"—allows steam or perspiration to escape—while still remaining waterproof.

One problem with this "microporous expanded polytetrafluoroethylene" is that exposure to body oils eventually leads to a loss of its waterproofing quality. The company therefore searched for a coating that it could apply to the Teflon product. The first formula devised by its chemist involved a mixture of a Grace product, Hypol, a DuPont product, Diak 2, and a third chemical not involved in this lawsuit, xylene. Hypol, supplied by Grace during the peri-

od 1978–86, is a liquid that contains a relatively small amount (0.2% to 2.5%) of toluene diisocyanate (TDI); Diak 2, supplied by DuPont from 1978–84, is the trade name for ethylene diamine carbamate. Beginning in 1980, Gore began to add to the mix Mondur TD–80, a TDI-bearing product purchased from Mobay. Mondur TD–80 contained two isomers of TDI—80% was the 2,4 isomeric form, 20% was the 2,6 isomer. In 1983, Gore switched from the Mondur TD–80 to another Mobay product, Mondur HCB, which contained a "blocked" form of TDI.

The coating operation, as outlined in the record, involved essentially four steps. The first step was the mixing of the chemicals. The Hypol and the Mobay products were supplied in 55–gallon steel drums; the Diak 2 came in 40–pound cardboard drums. These drums were stored in a shed. When needed, the drums were taken to a mixing room where the contents were mixed to form the coating. The second step was the application of the coating to the microporous expanded Teflon membrane. The coated membrane was then passed through an oven where the heat chemically cured it; and finally, the cured product was laminated with a special adhesive onto various fabrics, which were then sold to Gore's customers.

The plaintiffs worked at or around one or more of these operations for varying periods of time in one or more of the several Gore plants in the Elkton, Md. and Newark, Del. area. They each claimed that they came into contact with raw and finished chemicals supplied by one or more of the defendants and that, as a result, they contracted chemically-related diseases and injuries to their throats, lungs, vocal chords, respiratory and central nervous systems, and other organs. Four of the plaintiffs made claims against all three defendants; seventeen sued only Mobay and Grace, alleging contact only with a TDI product and not with Diak 2; two sued only Grace; and one sued only Mobay.

As we indicated, each plaintiff pled three causes of action —negligence, breach of warranty, and strict liability. All three of those actions, however, were based on the allega-

tion that the defendants failed to give proper and adequate warnings to the plaintiffs of the dangerous propensities of their products. Despite some language in the pleadings alleging that the products were defective, the case was not presented below and is not argued before us as involving any design or manufacturing defect. The core averments were that defendants failed to give sufficient warnings to the plaintiffs of the risks to which they would be exposed by continuous contact with the substances and to supply the plaintiffs with knowledge of safeguards, apparel, and equipment necessary for their protection. The plaintiffs attempted to show that the defendants were aware of the dangerous propensities of their products, that they were aware as well of various safeguards and precautions that could have made the handling of the chemicals safer, that they failed to inform the plaintiffs of those safeguards and precautions, and that indeed they withheld vital information and actually misled Gore as to the propensities of the various products and as to the proper precautions to be taken.

Defendants raised a number of defenses to these claims. Certain of the plaintiffs, they said, were aware that they had chemically-related injuries more than three years before they filed suit and their actions were therefore time-barred. Other plaintiffs, they contended, had failed to prove that their injuries resulted from exposure to the defendants' products. The principal defense raised by all three defendants and common to all plaintiffs, however, was what has become known as the "sophisticated user" defense—essentially, that their customer, Gore, was technically proficient and well aware of the propensities of the substances and how best to deal with them, and that defendants were entitled to rely on Gore to provide a safe workplace for its employees. The trial court recognized this defense and instructed the jury on it. The plaintiffs contend that this is not a proper defense—that the Maryland appellate courts have not recognized it and, as a policy matter, should not recognize it. Moreover, they urge that, even if the defense is to be allowed, (1) this is not a proper case for it, and (2)

the articulation of it in the court's instructions was incorrect. We turn first to these issues.

## II. THE SOPHISTICATED USER DEFENSE

### A. *In General*

This Court discussed the sophisticated user defense recently in *Eagle–Pitcher Industries v. Balbos*, 84 Md.App. 10, 578 A.2d 228 (1990). The plaintiffs there sued various manufacturers and suppliers of asbestos-containing products for injuries they received through exposure to those products while employed at Bethlehem Steel Corporation. The defendants asserted, among other things, that they were relieved of responsibility for failure to warn the plaintiffs of the dangerous propensities of their products because Bethlehem was aware of those propensities and they reasonably relied on Bethlehem to warn its employees. We concluded that the evidence did not support the defense—that the defendants had no indication that Bethlehem would or did take any action to warn its employees or any precaution to safeguard them—and, for that reason, found no error in the court's refusal to give a sophisticated user instruction to the jury. Although we perhaps tacitly assumed that the defense was a valid one where the evidence supported it, we made no specific holding to that effect and did not address the associated issues raised here.

The most frequently cited articulation of this defense and the principles underlying it appears in *Goodbar v. Whitehead Bros.*, 591 F.Supp. 552 (W.D.Va.1984), *aff'd sub nom., Beale v. Hardy*, 769 F.2d 213 (4th Cir.1985). A number of employees of a large foundry who had developed silicosis sued the companies that had supplied silica-containing products to the foundry, complaining of their failure to warn them about the dangerous propensities of those products. Although, as here, the pleading alleged all three branches of a traditional product liability action—negligence, breach of warranty, and strict liability—because the action was governed by Virginia law and that law did not recognize

strict liability as a ground of recovery, the Court was obliged to deal with the sophisticated user defense only in the context of the other two theories of liability.

The Court began with the negligence claim, which it held was shaped and controlled by the principles set forth in Restatement (Second) of Torts § 388. That section states:

"One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous."

Focusing on paragraph (c) of § 388, the Court turned to comment n of the Reporter's Notes[1], dealing specifically with the situation in which a person supplies chattels to his immediate customer knowing that those chattels will likely be used by others—e.g., customers or employees of his customer. Comment n notes that "[i]n all such cases the question may arise as to whether the person supplying the chattel is exercising that reasonable care, which he owes to those who are to use it, by informing the third person through whom the chattel is supplied of its actual character." The Reporter observes:

---

1. The Reporter was Dean William L. Prosser whose paramount expertise in the law of torts has long been recognized by Federal and State courts throughout the country.

"Giving to the third person through whom the chattel is supplied all the information necessary to its safe use is not in all cases sufficient to relieve the suppliers from liability. *It is merely a means by which this information is to be conveyed to those who are to use the chattel.* The question remains whether this method gives a reasonable assurance that the information will reach those whose safety depends upon their having it. All sorts of chattels may be supplied for the use of others, through all sorts of third persons and under an infinite variety of circumstances. This being true, it is obviously impossible to state in advance any set of rules which will automatically determine in all cases whether one supplying a chattel for the use of others through a third person has satisfied his duty to those who are to use the chattel by informing the third person of the dangerous character of the chattel, or of the precautions which must be exercised in using it in order to make its use safe."
(Emphasis added.)

The comment then goes on to discuss a number of factors that a court will have to consider in determining whether information given by the supplier to its immediate customer will suffice to preclude liability for a failure to give adequate information directly to the ultimate users or handlers of the chattel. The *Goodbar* Court summarized those considerations, stated in more narrative form in the comment, as follows:

"These include: (1) the dangerous condition of the product; (2) the purpose for which the product is used; (3) the form of any warnings given; (4) the reliability of the third party as a conduit of necessary information about the product; (5) the magnitude of the risk involved; and (6) the burdens imposed on the supplier by requiring that he directly warn all users. This comment recognizes that a balancing of these considerations is necessary in light of the fact that no single set of rules could possibly be advanced that would automatically cover all situations. Critical in my view is the recognition [in the comment]

that '[m]odern life would be intolerable unless one were permitted to rely to a certain extent on others doing what they normally do, particularly if it is their duty to do so.' "

591 F.Supp. at 557.

The Court then considered a number of cases in which the supplier had indeed been excused from liability for negligent failure to warn employees of its customer upon a finding that the customer was aware of the danger in the product and had good reason to try to protect its employees from the danger. Those cases, said the Court at 560–61:

"stand for the proposition that in alleged negligent failure to warn situations such as this litigation, if the danger related to the particular product is clearly known to the purchaser/employer, then there will be no obligation to warn placed upon the supplier. Instead, it becomes the employer's responsibility to guard against the known danger by either warning its employees or otherwise providing the necessary protection. Stated another way, when the supplier has reason to believe that the purchaser of the product will recognize the dangers associated with the product, no warnings are mandated."

Accepting the validity of that principle, the Court then looked at the factual circumstances before it on a summary judgment motion. It first concluded that the foundry was a large employer and was thoroughly familiar with the dangerous propensities of the silica-containing products that it used. Those products were delivered in railroad car or truck lots, and thus any written warnings accompanying the delivery would not likely reach employees who did not deal with the unloading of those vehicles. Additionally, the Court noted that the identification of the persons actually using or exposed to the products "would require a constant monitoring by the suppliers in view of the constant turnover of the Foundry's large work force," the "confusion arising when twelve different suppliers and the Foundry each try to cope with the awesome task of instructing Foundry workers," and that "in a commercial setting, it would be

totally unrealistic to assume that the suppliers would be able to exert pressure on a large, industrial customer ... to allow the suppliers to come in and educate its workers about the hazards...." Upon these and other circumstances, the Court concluded at 566 that the suppliers had no duty to give direct warnings to the Foundry employees "when only the Foundry is in a position to communicate effective warning and accordingly should be the one to shoulder any burden of effective warning."

In reaching this conclusion, it is evident that the Court found most telling the practical difficulty, if not the virtual impossibility, of the suppliers actually being able to communicate adequate warnings directly to the customer's employees, much less of their being able to institute or assure the institution of effective safety precautions in their customer's plant. This is clear not only from the text of the Court's own remarks but as well from its quotation of this passage from Schwartz and Driver, *Warnings In The Workplace: The Need For A Synthesis Of Law And Communication Theory,* 52 U.Cin.L.Rev. 38, 43 (1983):

"The extension of workplace warnings liability unguided by practical consideration has the unreasonable potential to impose absolute liability in those situations where it is impossible for the manufacturer to warn the product user directly. In the workplace setting, the product manufacturer often cannot communicate the necessary safety information to product users in a manner that will result in reduction of risk. Only the employer is in a position to ensure workplace safety by training, supervision and use of proper safety equipment. Designating the manufacturer an absolute insurer of its product removes the economic incentives that encourage employers to protect the safety of their employees."

Although the breach of warranty (of merchantability) claim rested, of course, on a different basis than the negligence action, the Court concluded that the foundry's extensive knowledge of the propensities of the products in question also precluded liability on that theory as well. Effec-

tively, the Court held that where the purchaser knows of the dangerous condition of the product, there can be no implied warranty to him that that condition does not exist. Further, because in the breach of warranty action the employees claimed derivatively through the employer, their rights were no greater than those of the employer.

Upon this analysis, the Court granted summary judgment for the defendants, and, in a very brief opinion, the Fourth Circuit Court of Appeals affirmed.

The legal premise underlying this defense, and indeed the defense itself, seems to have gained fairly wide acceptance. *See, for example, Purvis v. PPG Industries, Inc.*, 502 So.2d 714, 719–22 (Ala.1987); *Shell Oil Co. v. Gutierrez*, 119 Ariz. 426, 581 P.2d 271 (1978); *Sliman v. Aluminum Co. of America*, 112 Idaho 277, 731 P.2d 1267, 1270–73 (1986); *Cooley v. Quick Supply Co.*, 221 N.W.2d 763 (Iowa 1974); *Jones v. Hittle Service, Inc.*, 219 Kan. 627, 549 P.2d 1383, 1394 (1976); *Tasca v. GTE Products Corp.*, 175 Mich.App. 617, 438 N.W.2d 625 (1989); *Whitehead v. Dycho Co.*, 775 S.W.2d 593 (Tenn.1989); *Alm v. Aluminum Co. of America*, 717 S.W.2d 588, 591 (Tex.1986); *Reed v. Penn Walt Corp.*, 591 P.2d 478, 22 Wash.App. 718, *aff'd and appeal dismissed*, 604 P.2d 164, 93 Wash.2d 5 (1979). *Cf. Lee v. Electronic Motor Division*, 169 Cal.App.3d 375, 388–89, 215 Cal.Rptr. 195 (1985); *Wilson v. E–Z Flo Chemical Co.*, 281 N.C. 506, 189 S.E.2d 221, 224–25 (1972); *Seibel v. Symons Corp.*, 221 N.W.2d 50 (N.D.1974). As the Delaware Court, after citing a number of cases, noted in *In re Asbestos Litigation (Mergenthaler)*, 542 A.2d 1205, 1211 (Del.Super. 1986), "[i]t would appear, then, that some version of a 'sophisticated purchaser' defense is the norm in most jurisdictions." The split of authority, the Court observed, was in the application of the defense:

"Some [courts] hold that where there is a sophisticated purchaser knowledgeable of the dangers of the product, the supplier can, as a matter of law, rely on that purchaser/employer to inform its employees.

. . . . .

Other courts hold that where there is a sophisticated purchaser, there is no duty to warn provided that it is reasonable for the supplier to believe that the purchaser/employer will warn its employees under the circumstances."

*Id.* at 1210.

Tacitly acknowledging the acceptance of this defense by other courts, the plaintiffs remind us that Maryland has never affirmatively accepted it and that, if it is to be accepted in an action based on negligence or breach of warranty, it ought not to be accepted as a defense to an action based on strict liability.

As we indicated earlier, aside from our consideration of the defense in *Eagle–Pitcher, supra,* 84 Md.App. 10, 59–66, 578 A.2d 228, it has not been explicitly adopted by a Maryland Court. Three respected judges of the United States District Court for the District of Maryland have, however, upon an analysis of Maryland law, predicted that Maryland would recognize the defense and have applied Maryland law on that basis. In *Higgins v. E.I. DuPont de Nemours, Inc.,* 671 F.Supp. 1055 (D.Md.1987), *aff'd,* 863 F.2d 1162 (4th Cir.1988), a group of Baltimore City firefighters, claiming injuries from exposure to paint products purchased by the Fire Department, sued DuPont, the manufacturer of the paint, and Eastman and Union Carbide, who supplied certain chemicals to DuPont that DuPont used in making the paint product. The actions were based on negligence, breach of implied warranty, and strict liability, all founded on a failure to give adequate warnings. Eastman and Union Carbide asserted a sophisticated user defense, contending that DuPont was warned and aware of the propensities of the respective chemicals they supplied and that they had no duty to warn unknown and unknowable customers of DuPont, much less employees of those customers.

Judge Smalkin examined the analysis provided in *Goodbar, supra,* and concluded, at 1059:

"In the absence of any controlling Maryland decision, this Court is confident that the Court of Appeals of Maryland would recognize the sophisticated user/bulk supplier defense in a negligent failure to warn case.... The Court of Appeals of Maryland has clearly adopted § 388 as an authoritative statement of the general principles regarding negligent failure to warn in Maryland.... The recognition of the sophisticated user/bulk supplier defense logically follows from the sense of § 388, as clearly pointed out by Judge Kiser in *Goodbar*, and as recognized by the Fourth Circuit.

This Court is similarly confident that the Court of Appeals of Maryland would also recognize the sophisticated user/bulk supplier defense in a failure to warn claim asserted on the ground of strict liability under *Restatement (Second) Torts* § 402A (1965). The parties have not cited, nor has the Court independently discovered, a Maryland case recognizing any doctrinal distinction between § 388 negligent, and § 402A strict liability, failure to warn cases."

Apart from the absence of authority recognizing a distinction between the two theories in a failure to warn case, the Court relied on a Fourth Circuit holding and pronouncements of Dean Prosser to the effect that there is no such distinction. In *Werner v. Upjohn Co., Inc.*, 628 F.2d 848, 858 (4th Cir.1980), for example, the Court observed:

"The distinction between negligence and strict liability lessens considerably in failure to warn cases. Under a negligence theory the issue is whether the defendant exercised due care in formulating and updating the warning, while under a strict liability theory the issue is whether the lack of a proper warning made the product unreasonably dangerous. Though phrased differently the issue under either theory is essentially the same: Was the warning adequate?"

Upon this analysis, applied to the facts before him, Judge Smalkin concluded that DuPont was fully aware of the propensities of the chemicals supplied by Eastman and

Union Carbide and that it "was in a far better position than either of the bulk suppliers to communicate an effective warning to its customers ... and to their customers' employees...." *Id.* at 1062. He therefore granted summary judgment in favor of the suppliers, a judgment later affirmed by the Fourth Circuit Court of Appeals.

The statement of the defense, as set forth in *Goodbar* and *Higgins*, and Judge Smalkin's conclusion that it was cognizable under Maryland law were followed by Judges Black and Niemeyer, respectively, in *Sara Lee Corp. v. Homasote Co.*, 719 F.Supp. 417 (D.Md.1989) and *Singleton v. Manitowoc Co., Inc.*, 727 F.Supp. 217 (D.Md.1989). In *Dechello v. Johnson Enterprises*, 74 Md.App. 228, 536 A.2d 1203 (1988), this Court confirmed the underpinning of Judge Smalkin's prediction that, if the defense were recognized, it would apply not only to an action grounded on negligence, but also one grounded on strict liability. Although the sophisticated user defense was not at issue there, we concluded, at 236, 536 A.2d 1203, that:

> "Maryland has long recognized a duty on the part of sellers to warn of latent dangers attendant upon a proper use of the products they sell, where injury is foreseeable. The standard applied in that regard, *under all three theories of negligence, breach of implied warranty, and strict liability,* has been that stated in Restatement (Second) of Torts § 388."

(Emphasis added.) For the proposition that § 388 applied to such actions based on strict liability, we cited *Moran v. Faberge*, 273 Md. 538, 544, 332 A.2d 11 (1975).

It is true, as plaintiffs assert, that at least two States— Pennsylvania and New Jersey—appear to hold that the sophisticated user defense is not applicable in actions based on strict liability. The Pennsylvania decisions all stem from a statement made in *Berkebile v. Brantley Helicopter Corp.*, 462 Pa. 83, 337 A.2d 893, 903 (1975) that, where warnings are required to make a product non-defective, the manufacturer has a duty "to provide such warnings in a form that will reach the ultimate consumer" and that "[t]he

duty to provide a non-defective product is non-delegable." From this, a number of Federal courts applying Pennsylvania law and at least one lower State court have concluded that knowledge on the part of the immediate purchaser is of no consequence. *See Neal v. Carey Canadian Mines, Ltd.,* 548 F.Supp. 357 (E.D.Pa.1982); *Brown v. Caterpillar Tractor Co.,* 741 F.2d 656 (3d Cir.1984); *Mackey v. Maremount Corp.,* 350 Pa.Super. 415, 504 A.2d 908 (1986). One New Jersey court was even more straightforward; in *Olencki v. Mead Chemical Co.,* 209 N.J.Super. 456, 507 A.2d 803, 806 (1986), the Court held that "knowledge of the risk that employers may not adequately warn their employees is imputed to the defendants in a strict liability action" and that, accordingly, in such an action "the manufacturer cannot be absolved of the duty to warn." *See also Menna v. Johns–Manville Corp.,* 585 F.Supp. 1178 (D.N.J.1984); *Billsborrow v. Dow Chemical, U.S.A.,* 139 Misc.2d 488, 527 N.Y.S.2d 352 (Sup.1988); *Montgomery Elevator Co. v. McCullough,* 676 S.W.2d 776 (Ky.1984); and *Russo v. Abex Corp.,* 670 F.Supp. 206 (E.D.Mich.1987), applying Michigan Law, *but compare Tasca v. GTE Products Corp., supra,* 438 N.W.2d 625, rejecting the *Russo* supposition as to Michigan law.

Part of the problem that may lead some to look askance at this defense is in the language that some courts have used to describe it, in particular the notion that, where the elements or prerequisites of it exist, the supplier is "absolved" of any duty to warn ultimate users. That notion is not only unnecessary to the defense but in fact is inconsistent with the rationale of comment n to Restatement § 388. There *is* a duty to warn of defects or propensities that make a product hazardous, and that duty *does* extend ordinarily to those who may reasonably be expected to use or come into harmful contact with the product. It is *not* a duty, we think, from which the supplier can be entirely *absolved.* The question, rather, is, what conduct will suffice to discharge that duty?

■ Viewed in that context, the defense is not only logical but necessary. Where it is impracticable for the supplier to give adequate warnings directly to all who may use or come into contact with the product, some substitute for such direct warnings is required, even in strict liability cases. Otherwise, as Messrs. Schwartz and Driver observed, *supra,* strict liability would become, in effect, absolute liability. As comment n to Restatement § 388 makes clear, the focus remains on the conduct of the supplier, but that conduct is judged in light of the circumstances. Among those circumstances are the feasibility of giving direct warnings to all who are entitled to them and, where that is not feasible, whether the supplier acted in a manner reasonably calculated to assure either that the necessary information would be passed on to the ultimate handlers of the product or that their safety would otherwise be attended to. In such a situation, that is all that reasonably can be asked and it is all, we think, that the law requires. The Fourth Circuit Court of Appeals, applying Virginia law in *Willis v. Raymark Industries, Inc.,* 905 F.2d 793 (4th Cir.1990), made the point exactly, stating at 797: "Comment n clearly focuses on what the product manufacturer knew and the reasonableness of its reliance on the employer prior to and during the time the workers were exposed." (Emphasis omitted.)

To this extent, and in this form, we recognize the defense as a part of Maryland product liability law.

### B. *This Case*

In arguing this defense, appellees contended, and presented evidence to show, that (1) Gore was, in fact, fully aware of the propensities of the various substances and that it took reasonable measures to protect its employees, (2) appellees were aware of Gore's knowledge about these substances and reasonably relied on Gore to protect its employees, (3) appellees had no ability to give direct warnings to Gore's employees or to institute, directly, any safety or precautionary measures in Gore's plants, and (4) the infor-

mation and warnings given to Gore with and about the products were adequate. The plaintiffs dispute elements (1), (2), and (4) and contend that (3) is irrelevant.

### Direct Interaction With Gore Employees

We have already concluded that element (3) is indeed relevant, and because the evidence bearing on that was essentially undisputed we may quickly dispose of that item. As we indicated, Gore regarded its manufacturing process as a trade secret. Both its suppliers and its employees were required to sign confidentiality agreements; many of the exhibits in this case that bear on the process are subject to a protective order. More significant—indeed dispositive—was the testimony of a Gore official, John Conbere, called by the plaintiffs. Dr. Conbere confirmed that Gore did not invite other chemical companies into its plants because of its trade secrets policy and that it regarded defendants in particular as potential competitors. He stated that they would not be told how the substances they supplied would be used or with what they might be mixed. They would not be allowed to watch Gore's production; except at Gore's invitation, they would not be allowed into the production area for any purpose; they were not told how Gore's plants were laid out, the configuration of Gore's equipment, how the ventilation system was set up, the temperatures at which the ovens were operated, or the speeds at which the coated Teflon membrane moved through the oven. They were not invited in to see if Gore employees were wearing respirators or whether the warnings they supplied with their products were posted in the plant. For security reasons, Gore insisted that the Grace product, Hypol, and the DuPont product, Diak, be shipped in containers that were coded and did not reveal the product name. Another Gore employee, Dexter Worden, testified that Grace was aware that Gore used Hypol in the fabric division "but [was] not aware of how we used it."

Upon this evidence, it is clear that the defendants had no practical ability to give direct warnings to all the Gore

employees who might come into contact with their products, to inform them of how best to handle those products safely, to institute directly any safety measures in the Gore plants, or to monitor Gore's production and safety program. There is no doubt that the evidence sufficed to establish the third element.

### Gore's Knowledge, Sophistication, and Duty

The other three elements overlap to some extent. We start with a summary of some of the evidence as to Gore's own knowledge, sophistication, and duty. Much of this centers around six Gore employees—Dexter Worden, Robert Henn, David Wright, Jack Kramer, David Hazlebeck, and John Conbere. Mr. Worden, though not a college graduate, had some technical training and had developed considerable expertise in industrial chemistry. He had worked at DuPont as a lab technician since 1957, joining Gore in 1975. He was familiar with tetrafluoroethylene and with the chemicals used by Gore in its coating process. Mr. Henn, a chemist, came to Gore in 1978. The owner of several chemical patents, he experimented with various chemicals, including TDI products and Diak, to develop the coating mixture for Gore. Mr. Wright, a chemical engineer, joined Gore in 1981, essentially replacing Mr. Henn, who had assumed other responsibilities with the company, in superintending the coating operation. Mr. Kramer was also a chemical engineer. He joined Gore in 1982, initially working with the Teflon membrane itself and then, in 1984, taking over from Mr. Wright in the coating operation.

David Hazlebeck, possessing a doctorate in chemical engineering, came to work for Gore, after a 15–year stint with DuPont, in 1979. He recruited, or assisted in the recruiting of, Messrs. Henn, Wright, and Kramer, and performed a supervisory role. John Conbere came to Gore in September, 1981, with a doctorate in organic chemistry. He initially worked with the Teflon membrane.

*(1) Diak 2*

■ Diak 2 (ethylene diamine carbamate) is formed from the reaction of volatile ethylene diamine and carbon dioxide gas. At room temperature, it is a stable white crystalline powder. When heated sufficiently, however, the carbamate splits into its constituent parts and the ethylene diamine is released in the form of vapor. DuPont developed the product as a curing agent for use in the manufacture of its synthetic rubber product, Viton. It eventually discarded the product for that purpose, however, because it found that, in the manufacturing process, the ethylene diamine was released too quickly, thus curing the Viton prematurely.

In 1977, Gore, which had been searching for a curing agent for its own process, met with DuPont to investigate the possibility of using Diak 2. Gore was then a good customer of DuPont, and three of its representatives, Bill Gore, Dexter Worden, and David Hazlebeck, had formerly worked for DuPont, two as chemical engineers, one as a laboratory technician. Gore obtained 5,000 pounds of the product from DuPont in order to test it. DuPont initially did not care to resume the manufacture of Diak 2 and instead, in August, 1978, entered into a license agreement under which it agreed to furnish Gore with the technology for making the product so that Gore could make the Diak 2 itself.

With the material sent to Gore as part of this agreement was a Material Safety Data Sheet (MSDS) which, among other things, warned that Diak 2 was an irritant if it was inhaled or came into contact with skin or eyes. Under the heading "Special Protection Information," it stated, "Use a dust respirator, if dust situation exists" and "Use supplied-air mask or self-contained breathing apparatus where exposure to parent amine, ethylene diamine exists." It advised the wearing of chemical goggles, rubber gloves, and protective covering for exposed skin, and referred the reader to other publications, including the MSDS on ethylene diamine. Mr. Worden added that, in obtaining the license, Gore

received "safety information about each of the materials that were used to form the carbamate and safety information concerning it as a carbamate."

Worden was aware that when the carbamate decomposed, the product would have to be treated as ethylene diamine, "which has stronger acute effects" and "would become more of a problem as a respiratory hazard." He was told by DuPont, at an early stage of their discussions, that "there were potential health hazards of ethylenediamine carbamate ... in particular after it decomposed to an ethylenediamine." Worden was aware as well of National Institute for Occupational Safety and Health (NIOSH) Occupational Health Guideline for Ethylenediamine, a copy of which was in Gore's library, which, among other things, recited that the then-current OSHA standard for the substance was 10 parts per million parts of air averaged over an eight-hour work shift, that short-term exposure to ethylene diamine vapors can cause irritation of the eyes, nose, and throat, that repeated or prolonged overexposure can cause dermatitis, skin allergy, and liver, kidney, and lung damage, and that a physician should be consulted "if anyone develops any signs or symptoms and suspects that they are caused by exposure to ethylenediamine." Both the MSDS supplied by DuPont and the NIOSH Guideline reported that repeated exposure and severe exposure to ethylene diamine was uniformly lethal to rats. The Guideline continued that:

> "Good industrial hygiene practices recommend that engineering controls be used to reduce environmental concentrations to the permissible exposure level.... Respirators may be used when engineering and work practice controls are not technically feasible, when such controls are in the process of being installed, or when they fail and need to be supplemented."

It then set forth specifications for "Minimum Respiratory Protection Required Above 10 ppm [Parts Per Million]" and a recommended procedure for cleaning spills and leaks.

Mr. Henn stated that he was aware of the skin and respiratory hazards from Diak 2 before the product was ever used by Gore, including the fact that the ethylene diamine could be separated from the carbon dioxyde at even lower temperatures than advised by DuPont. Mr. Wright and Dr. Conbere were also familiar with the hazards of Diak 2. Wright stated that employees handling Diak 2 wore protective garments that covered their entire body as well as respiratory protection and gloves because of a concern "about the dust and also any free diamine that might be in the Diak." Dr. Conbere testified that there wasn't much literature to be had on ethylene diamine carbamate but that the hazards of ethylene diamine "have been well known for several years."

At some point after the licensing agreement was signed and much of the technical information was disclosed to Gore, the parties decided not to proceed through the agreement but rather to have DuPont resume the manufacture of the Diak 2 and sell it to Gore. That arrangement lasted until 1984, when DuPont stopped producing Diak 2 and Gore switched to an allied product, Diak 1.

The four plaintiffs who sued DuPont did not seriously dispute that Gore had, either from its own resources or from information supplied by DuPont, the level of knowledge about Diak 2 and ethylene diamine carbamate reflected above. Because their case rested to a large extent on the non-viability of the sophisticated user defense, they regarded Gore's knowledge as essentially irrelevant and focused instead on the information attached to the product actually delivered by DuPont. That information, in the form of the MSDS and the drum label, they contended was inadequate and defective. Their expert witness, Dr. Abraham, opined that these documents "didn't give Gore sufficient information that when the employees and users of the product were exposed to the product once it was heated, they could not properly protect themselves and others from being injured." He also noted that they failed to warn the

employees about the need for respiratory protection or about the symptoms of overexposure.

This evidence has to be taken in context. For one thing, because the Diak 2 was removed from the drum and mixed with other chemicals in a mixing room, the employees involved in the coating operation would not have had occasion to see the drum label. Nor did the plaintiffs actually removing the Diak 2 from the drum and mixing it with the other substances have to contend with the decomposition of the product as it was heated in the coating operation. The drum label did warn that contact with the carbamate powder could cause irritation and allergic skin reaction and that people handling it should "[a]void contact with eyes, skin and clothing," "[w]ash thoroughly after handling," "[a]void breathing dust," and "[u]se with adequate ventilation." Most significant, however, is that, in the context of a sophisticated user defense, the adequacy of the direct warnings to the ultimate users is only one factor to consider, and not necessarily the decisive one. As we have indicated, the information supplied on the MSDS and drum label was only a small part of the data supplied to Gore by DuPont or otherwise known to it. There is no doubt, in our view, that the evidence sufficed to show that Gore was well aware of the nature and characteristics of Diak 2 and of the hazards presented by it both in powder form and upon its decomposition through heating. The information supplied to Gore was adequate to allow it to take proper precautions to protect its employees.

We turn then, finally, to whether, on this record, the evidence sufficed to show that DuPont reasonably relied on Gore to take the necessary measures. We believe that it did. Gore, of course, like all employers, has a legal duty to provide a safe workplace for its employees, and, although as we observed in *Eagle–Pitcher v. Balbos, supra*, 84 Md.App. 10, 64–65, 578 A.2d 228, the supplier of a hazardous substance cannot rely just on that legal duty in every instance, here there was more than just the overall legal duty. DuPont knew the Gore personnel—both the manage-

ment and the chemists and engineers responsible for safety and operations. Through the licensing agreement, they supplied Gore with all the information necessary to permit Gore to produce the substance itself.

Unlike the situation in *Eagle–Pitcher*, DuPont had no reason to suspect that Gore would not take appropriate precautions to protect its employees. Given its lack of knowledge (and lack of ability to gain knowledge) of exactly how Gore intended to use the Diak 2 and its inability even to observe, much less to superintend, Gore's operation, discussed above, a jury could properly find from the evidence that DuPont reasonably relied on Gore to protect its employees from the various hazards of the product.

## (2) TDI Products

The actions against Mobay, based on its supply of Mondur TD–80 and Mondur HCB, and Grace, based on its supply of Hypol, all arise from injuries allegedly suffered from exposure to the TDI in those products.[2] The common premise of those actions is the failure to warn of the dangers of TDI and to inform Gore and its employees of necessary and available precautions to protect the employees.

In the context of the sophisticated user defense, we apply the same analysis set forth above with respect to the Diak 2, beginning with the conclusion that neither Mobay nor Grace were in any better position than DuPont to superintend Gore's operation. They had no access to the plants and no precise information on how their products were to be used by Gore. As in the case of DuPont, the evidence

---

2. All but one of the plaintiffs who sued Mobay based their complaint at least in part on exposure to Mondur TD–80, although some contended that they had been exposed to both Mondur TD–80 and Mondur HCB, which also contains TDI. One plaintiff, who worked in a different plant on a different operation, sued by reason of exposure to Mondur HCB alone. As it was the TDI that made both substances hazardous, our analysis of the sophisticated user defense with respect to the Mondur TD–80 would also apply to the Mondur HCB.

sufficed to allow the jury to conclude that they had no practical ability to give direct warnings to all Gore employees who might come into contact with their products or to institute or monitor safety programs in Gore's plants. In light of that, we turn to examine whether they acted reasonably in supplying the information they did to Gore and in relying on Gore to take proper precautions.

A key witness in this regard was B.K. Kwon, an industrial hygienist called as an expert by Mobay. Mr. Kwon stated that there were six things an employer needs to know about an industrial chemical in order to protect its workers: what the chemical is, how it is to be used, the hazards associated with using the chemical, the physical properties of the chemical (is it a solid, liquid, or gas, is it volatile or flammable, etc.), how best to control it (whether through a ventilation system or protective devices), and what to do in the event of exposure (first aid, clean-up). Kwon added that OSHA regulations establish a clear preference for preventing, rather than treating, exposure to hazardous substances and emphasize the development of proper ventilation systems or enclosed areas as opposed to relying on respirators and protective clothing as the first line of defense.

Other evidence, brought to Mr. Kwon's attention, showed that Gore had developed an extensive library of materials detailing the characteristics and hazards of TDI and recommending precautions and safety measures in dealing with it. Included in these materials was a 1973 NIOSH publication laying out detailed standards for dealing with the substance. Mr. Worden was familiar with that publication. According to Mr. Kwon, that document alone "contains all of the information we want to know except method of usage," which only Gore would know. He confirmed that "if somebody has this document, whoever the buyer is has sufficient information to start up a good program to protect workers using toluene diisocyanate." Another publication known to Mr. Worden was Patty's Industrial Hygiene and Toxicology, which Kwon characterized as "the bible for

designing ventilation systems. It tells you exactly what kind of design you have to have for a particular type of work you do."

Mr. Kwon also testified about industry practices in giving warnings. Unlike consumer products, which have specific uses to which warnings can be directed, industrial chemicals can be used in many different ways and have many different hazards. With respect to them, manufacturers supply more general "performance" information for their customers through labels and MSDS's. It then becomes the responsibility of the customer to develop appropriate measures to protect their workers based on their use of the substances.

Kwon stated that the appropriate standard for labeling was the American National Standard Institute (ANSI) 1976 Standard for the precautionary labeling of hazardous industrial chemicals, which was in evidence, and that the Mobay label placed on its Mondur TD–80 drums, also in evidence, "not only meets ANSI standard which I just stated but it exceeds the standard." [3] He gave a similar opinion with respect to the Mobay label applied to the Mondur HCB. The Mobay MSDS's, he said, were also adequate. The one supplied with respect to the Mondur TD–80 was "totally adequate in developing a health and safety program to prevent overexposure" and "contain[ed] all pertinent information required." The MSDS for the Mondur HCB too was "totally adequate."

---

**3.** The plaintiffs who sued Mobay complained, as noted, of respiratory damage and injury to internal organs by reason of exposure to both the raw chemical and its vapors. The label attached to the Mondur TD–80 prominently displayed a skull and cross-bones and the word "POISON." It stated, in moderately large type "DANGER! HARMFUL IF INHALED. CAUSES EYE, SKIN, OR RESPIRATORY IRRITATION. MAY CAUSE ALLERGIC SKIN OR RESPIRATORY REACTION." It also warned, in smaller print: "Do not get in eyes, on skin, on clothing. Do not breathe vapor. Keep container closed. Use with adequate ventilation. Wash thoroughly after handling. Do not expose container to direct sunlight or excessive heat. For additional information, see Mobay Material Safety Data Sheet."

The Grace product, Hypol, is designed to be mixed with water, from which mixture it forms a polyurethane foam. In that mixture, the small amount of TDI is destroyed in the polymerization reaction. Grace did not manufacture the TDI that it used in making the Hypol but bought that substance from other companies, including Mobay. Dr. Clifton Kehr, an organic chemist employed by Grace, described the development and properties of Hypol. He said, among other things, that Grace tried to make sure that its customers "are knowledgeable about the chemistry of polyurethanes; or if it's our opinion that they're not knowledgeable, we make it a practice to brief them in great detail on the characteristics of polyurethanes." Kehr had had several conversations with Mr. Worden, whom he found to be "very knowledgeable about the materials that we were dealing with." From the caliber of his questions and his familiarity with the nomenclature, Kehr concluded that "I didn't have to teach him anything." He had the same impression of Mr. Henn, with whom he also conversed on a number of occasions, finding both of them to be "technically competent individuals." His discussions with Mr. Worden concerned both "the monitoring of TDI" and "the analysis of TDI in the Hypol prepolymer."

In September, 1981, Dr. Kehr sent to Mr. Henn a copy of a document prepared by Grace entitled "Hypol Hydrophilic Polymers Toxicological Data," which, among other things, referred to and quoted from the 1973 NIOSH bulletin on TDI and warned that "TDI can be hazardous to health and must be used with care," that on contact with the skin or eyes, it produces irritation and may cause burns, and that "[i]nhalation of the vapor may be injurious to the lungs." Other publications giving detailed information about Hypol and TDI were also prepared and sent to Gore, including one noting that Grace's results and recommendations extend only to materials actually tested. It advised customers that Grace could not be responsible for the performance of materials "formulated beyond our control" and "strongly urge[d] complete toxicological testing of any specific prod-

ucts containing Hypol with reference to the particular end-use anticipated." Dr. Kehr explained that,

> "[I]t's impossible and in most cases impractical for us to know exactly what our customers are going to do with the product, what kinds of additives they're going to put in, and, therefore, once they have made their final or even initial formulation, if they're making a product, they should be addressing the safety characteristics of that product themselves."

This caveat was especially relevant with respect to Gore, which did not mix Hypol with water to make a foam, but rather with Diak 2 to make a coating. That, of course, left the prospect that all of the TDI might not be destroyed in the chemical reaction. Dr. Kehr stated that he was never told by Gore what it intended to do with the Hypol.

The label attached to the Hypol containers, in bold print, stated: "CAUTION! Avoid prolonged breathing of vapor. Use with adequate ventilation. In case of contact with eyes, flush immediately with plenty of water and contact physician. Avoid contact with skin." The MSDS identified the presence of TDI.

These documents and excerpts noted above were only a small part of the information supplied by Grace to Gore. Given the massive amount of information supplied to Gore personnel by both Mobay and Grace concerning TDI in general and their respective products in particular, coupled with the extensive knowledge otherwise possessed by Gore personnel, the evidence clearly sufficed to support a conclusion that Gore was aware of the hazards from TDI and the need to design and implement appropriate ventilation, enclosure, or other precautionary measures to protect its workers. The evidence also showed that Gore took its responsibility seriously and made significant and continuous efforts to design a safe workplace. Certain operations were enclosed; there was a ventilation system; and workers dealing with these chemicals were provided with and instructed to wear respirators or protective clothing.

The plaintiffs do not seriously dispute all of this. The thrust of their attack, apart from rejection of the sophisticated user defense and insistence on detailed direct warnings to each of them, is that Gore was misled by Mobay and Grace into relying on an air monitoring system for the testing of TDI known as the Marcali method which, they claim, turned out to be inadequate. As a result, both they and Gore innocently believed that the workplace was safe when, in fact, it was not.

In support of this contention, they offered evidence that, in May, 1984, after a number of Gore employees began experiencing respiratory problems, Gore formed a task force headed by Dr. Conbere to find the cause of the problem. In the course of that investigation, the task force discovered two things: one, that the Marcali system was wholly inadequate in detecting the 2,6 isomer of TDI and that that chemical, which had not been noted before, was indeed present in the plant environment; and two, that 10 years earlier Mobay had invented a different air monitoring system, known as the "nitro method," which was much more reliable in detecting the 2,6 isomer. Their argument, as summarized in their brief, is that both Mobay and Grace knew that Gore was using and relying on the Marcali method of air monitoring and that such method was unreliable and that neither warned Gore that the method was unreliable.

Initially, in this regard, we note that, as part of their argument, plaintiffs assert in their brief that the Marcali method was "recommended by Mobay and Grace." In fact, the record (at least the parts referred to by plaintiffs) does not support that statement. Dr. Conbere and Mr. Dauerty said that Gore got its Marcali kit from Mine Safety Appliance Company. The only evidence of involvement by the defendants was that, in 1978, Gore had borrowed a piece of equipment called the Monitaire, which apparently was a variation of the Marcali kit, from Grace. It used the kit for two-and-a-half weeks, found the results reassuring, and then returned it to Grace.

As early as 1977–79, Gore was aware that air monitoring was not a fool-proof method of detecting ambient TDI and that methods other than the Marcali method existed. The 1973 NIOSH document, with which Worden was familiar, noted that several methods had been developed for the determination of isocyanates in the air, including "the Ranta method described by Zapp," the Marcali method, various modifications of the Marcali method, and a gas chromatographic method "that is claimed to give a much greater sensitivity than existing methods." The reader was advised that this method or a modification of it "may prove to be a much better method for analyzing airborne TDI, and may resolve the present difficulties in detecting brief excursions of TDI, believed to be of toxicological importance, and still allow sensitive detection of TDI concentrations below the recommended time-weighted average."

In 1978, Worden consulted with an immunologist, Dr. C. Roger Donoho, and learned from him that "TDI in particular and isocyanates in general could be a problem at virtually undetectable levels, at levels that we had no instrumentation to detect." Donoho gave him several articles confirming that proposition, one of which stated that "TDI is a volatile substance which may sensitize workers at levels undetectable even by sophisticated apparatus...." Donoho's advice was not to rely just on air monitoring but to test the employees who might be exposed to the substance. Worden summarized his conversation with Dr. Donoho in a company memorandum in February, 1979.

In 1981, following a number of instances of employees developing respiratory problems, Gore employed one John Mitchell, Jr. as a consultant to look into the causes of the problem—"to make sure that there wasn't something that we had missed." Mr. Mitchell's report, rendered in January, 1982, noted that the need to monitor TDI concentrations in the air of 0.02 to 0.005 ppm "sets a severe requirement on analytical methods" and that "[a] variety of techniques are now available to meet the different types of requirements." The report listed and described a number

of air monitoring methods, *including the so-called "nitro" method developed by Mobay.*

Finally, and perhaps most significant, was the admission by plaintiff's witness, Phillip Branca, a Gore employee who was part of Dr. Conbere's task force, that the high and previously undetected readings of TDI discovered by using the "nitro" method, were found either in places where no one worked (inside an oven or venting stack) or where the employees wore respirators.

In summary, apart from the lack of any evidence showing that the Marcali method was in fact recommended to Gore by Mobay or Grace, there was substantial evidence to show that the Marcali method was an officially recognized and commercially accepted method in wide use, that Gore was aware long before 1984 that other methods, including the one developed by Mobay, were also available, and that the plaintiffs were not, in fact, exposed to ambient TDI.

### Conclusion

Upon all of this evidence, we believe that a factual basis existed for the sophisticated user defense and that the court did not err in submitting that defense to the jury.

### C. *Court's Instructions*

Plaintiffs mount several, somewhat overlapping, attacks on the court's instructions dealing with the sophisticated user defense. Principally, of course, they complain that the defense was submitted to the jury in any form. We have already rejected that complaint. They also contend that the language of the instruction was improper—that it used an incorrect standard of sophistication and that it somehow allowed the defendants "to define the scope of their own duty." We have examined the text of the instructions and find no such error. We note, parenthetically, that the court limited the defense to only those plaintiffs who worked with the chemicals after they were taken from the drums and mixed, that is, those who could not have seen the labels on the drums, and did not allow the defense as to those

plaintiffs who handled the drums and were therefore in a position to receive direct warnings from the defendants. Moreover, although clearly objecting to the giving of any instruction on sophisticated user, once the court made clear that it intended to give such an instruction, the plaintiffs suggested and approved the particular language of the instruction. They insisted on it including the six factors derived from Restatement § 388, comment n and enumerated in *Goodbar v. Whitehead Bros., supra,* 591 F.Supp. 552, and *Higgins v. E.I. DuPont de Nemours, Inc., supra,* 671 F.Supp. 1055, and, when the court agreed to that, lead counsel responded, "Yes. If you're going to give one, that sounds like a good one." We find no cognizable error in the instructions.[4]

### III. PEREMPTORY CHALLENGES

■ Md.Rule 2–512(h) allows each party in a civil action four peremptory challenges. It provides, however, that several plaintiffs or several defendants "shall be considered as a single party unless the court determines that adverse or hostile interests between plaintiffs or between defendants justify allowing to each of them separate peremptory challenges not exceeding the number available to a single party."

At a pre-trial proceeding, each of the three defendants requested four peremptory challenges. The court rejected that request but found sufficient adversity between Mobay and the other two defendants to award the defendants eight peremptory strikes. Although plaintiffs complained about

---

4. At oral argument, the plaintiffs switched the focus of their complaint from the initial instructions to an additional instruction given in response to a question from the jury. They urged that the additional instruction differed in a material way from the initial instruction and may have confused the jury. Although the plaintiffs did "again object to the sophisticated user defense applying in this case ... and to the court's instruction to the jury in regard to the sophisticated user," no complaint was made about the particular language of the additional instruction or that it differed in any way from the initial instruction.

the court's willingness to let the defendants cooperate in the exercise of those eight challenges, they did not specifically object to the actual award of the four extra challenges or contest the finding of adversity between Mobay and the other defendants. At the commencement of trial proceedings, the court confirmed that the defendants would have eight peremptory challenges and, once again, no objection was made. After the jury was chosen, the court asked whether the panel was acceptable, and the plaintiffs responded in the affirmative.

Despite this acquiescence, the plaintiffs now complain that the court committed reversible error in allowing the four extra challenges. They have waived the complaint. *King v. State Roads Comm'n*, 284 Md. 368, 396 A.2d 267 (1979).

## IV. TRIAL SCHEDULE—CONTINUANCES

█ The plaintiffs' final complaint concerns certain interruptions in the trial—continuances lasting more than a day granted by the court either on its own initiative or upon request of the defendants. There were five such interruptions during the five-month trial. Although they tell us in their brief that these interruptions were "over the strenuous objections of plaintiffs' counsel," plaintiffs have not referred us to any specific place in the record extract (or the record) documenting such objections, and indeed the record, in most instances, fails to disclose an objection.

Trial commenced on June 5, 1989, and continued without interruption until June 27. On June 26, the court gave counsel a written trial schedule, which counsel have neglected to include in the record extract, but which apparently informed them that trial would recess after June 27 and resume on July 24—a delay of three-and-a-half weeks. No objection appears to have been made by the plaintiffs to that interruption, either when the court announced it on June 26 or when the court confirmed it at the conclusion of proceedings on June 27. Trial resumed as anticipated on

July 24 and continued through August 4, at which time, pursuant to the previously announced schedule, it recessed until September 6—a hiatus of four-and-a-half weeks. Again, no objection appears to have been made to this delay.

Trial resumed on September 6 and continued through September 8, at which point it was recessed until September 18. Whether this delay was part of the court's original schedule is unclear, but no objection was made when the court confirmed the recess at the end of proceedings on the 8th. There were no further interruptions in the plaintiffs' case, which ended on September 21.

The plaintiffs have not directed our attention to anything in the record extract (or the record) indicating the reason or reasons for these various postponements. They tell us in their brief that the interruptions were "in order to cope with [the court's] 'backlog' of criminal and civil cases, and to accommodate the jurors' summer vacation schedules as well as the Court's own vacation schedules." Whatever may have been the reasons, and we are certainly not prepared on this record to say that these were not good ones, the fact is that, by failing to provide us with a record reference to any objection to these continuances, the plaintiffs have waived their right to complain about them.

The first interruption in the defense case was a seven-day hiatus from September 27 to October 5, 1989. When the court announced that recess at the close of proceedings on the 27th, no one objected. The second, and final, interruption was a three-week period from October 6 to October 23, 1989. As with the other continuances, no complaint was made at the end of proceedings on October 6.

In their reply brief, plaintiffs iterate that they objected to the postponements in the defense case, citing us to "E 4385–5490." We are not about to scour 1105 pages of record extract looking for objections. We examined the proceedings of the days immediately preceding the various continuances and, as noted, discovered no objections there.

That is as far as we propose to go. As with the interruptions in the plaintiffs' case, we find the complaint to be waived.

## V.  CROSS APPEALS

As we indicated, each of the defendants has filed a defensive cross-appeal complaining either that the plaintiffs' claims were barred by limitations or that they failed to prove injury by reason of exposure to their respective products.  Because we find no merit in the plaintiffs' appeal, we shall affirm the judgments entered below, thereby making the cross-appeals moot.

JUDGMENTS AFFIRMED; APPELLANTS TO PAY THE COSTS.