Raymond G. O'NEAL, Plaintiff–
Appellant,

and

Lisa M. O'Neal, Plaintiff,

v.

CELANESE CORPORATION,
Defendant–Appellee,

and

Hoechst Celanese Corporation,
Defendant.

No. 91–1103.

United States Court of Appeals,
Fourth Circuit.

Argued March 5, 1992.

Decided Nov. 18, 1993.

George B. Levasseur, Jr., Cumberland, MD, argued (Ronald J. Levasseur, on brief), for appellant.

Stanley B. Rohd, Weinberg & Green, Baltimore, MD, argued (Sherry H. Flax, Matthew G. Dobson, on brief), for appellees.

Before WIDENER, Circuit Judge, CHAPMAN, Senior Circuit Judge, and MACKENZIE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

## OPINION

WIDENER, Circuit Judge:

The appellants, Raymond and Lisa O'Neal, were plaintiffs below. They claim that Raymond O'Neal suffered lead poisoning when he used a welding torch to cut metal coated with lead-based paint and inhaled the fumes from the burning paint. At the time, O'Neal was employed by Trans America Liquidators, which had purchased the contents of a factory owned by the defendant, Celanese. Trans America was in the process of dismantling some spinning machines that it had purchased so that they could be removed from the Celanese plant.

The theory of the plaintiffs' case against Celanese was that Celanese had breached its duty to warn Raymond O'Neal about the presence of lead paint on the interior of the spinning machines, and that this breach was the proximate cause of O'Neal's lead poisoning. The trial was bifurcated as to the issues of liability and damages, and the issue of liability was sent to the jury. After the jury

returned a verdict on the issue of liability against the defendant, Celanese Corp., the district court granted a j.n.o.v. and conditional new trial in favor of Celanese. The O'Neals appeal, and we now affirm the j.n.o.v., now called judgment as a matter of law under Fed.R.Civ.P. 50.

## I.

From the late 1920s until the early 1980s, Celanese operated a fiber production and weaving facility in Cumberland, Maryland. This facility, known as the Amcelle plant, extruded acetate and triacetate yarn and weaved it into fabric. Because of the declining demand for the fibers produced at Amcelle, Celanese closed the facility in the early 1980s. Celanese ultimately contracted with Trans America for the sale and removal of the contents of the Amcelle plant, and Trans America bought the same.

The problem in this case arose when Trans America used cutting torches to complete the dismantling process on the spinning machines in Spinning Block One. These spinning machines had been used to transform a mixture referred to as "dope," which contained 70–80% acetone, into acetate yarn. When they were first built, between 1924 and 1928, red lead, a primer and sealant compound containing lead that has a distinctive red-orange color, was used to seal the joints between the sections of the spinning machines and also around the row of windows located along the top of each row of machines. Red lead also was used when the machines were modified in 1941, and possibly when certain repairs were made as late as 1972.

Red lead was not visible until the spinning machines had been partially dismantled. Each row of machines had an outer sheet-metal cover, and under that, two layers of insulation. It was primarily on the inner hull, beneath the sheet metal cover and insulation layers, that red lead was used. According to the plaintiffs, Raymond O'Neal inhaled lead when he used a cutting torch to cut the bolts securing sections of the inner hull, and possibly also when he cut the catwalks and other supporting apparatus. Even though the dense smoke in the spinning area where he was working made it difficult to breathe, O'Neal did not wear a respirator, and never asked anyone if he could have one. During an interview with Martin Kline, an investigator with Maryland Occupational Safety and Health (MOSH), O'Neal said that he had not been wearing a respirator "because it was too uncomfortable to wear under his welding hood."

O'Neal began cutting the inner hulls of the spinning machines with a torch on February 27, 1985. On the same day, Kline from MOSH attached an air sampling device to O'Neal's belt and collar. Kline was concerned about the presence of lead because "[m]ost of the older paints used in industry did have lead and this was an old facility." In fact, tests performed on the air samples did show unacceptably high lead levels, and on March 11th torch burning was discontinued in the spinning areas until Trans America, in coordination with Kline, was able to reduce the level of emissions from burning and use adequate respirators.

This court recently stated the rules that govern a judgment notwithstanding the verdict as follows:

> A district judge may overturn a jury verdict on a motion for j.n.o.v. only if "there is no legally sufficient evidentiary basis for a reasonable jury to have found for [the prevailing] party." Fed.R.Civ.P. 50(a)(1). In making this determination, the judge is not to weigh the evidence or appraise the credibility of witnesses, but must view the evidence in the light most favorable to the non-moving party and draw legitimate inferences in its favor. *Mays v. Pioneer Lumber Corp.*, 502 F.2d 106, 107 (4th Cir.1974) [*cert. denied* 420 U.S. 927, 95 S.Ct. 1125, 43 L.Ed.2d 398 (1975) ]. Our review of the district court's action is de novo.

*Anheuser–Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 318 (4th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 206, 121 L.Ed.2d 147 (1992). "However, the jury may only draw inferences from the evidence that are 'reasonably probable,' and 'mere speculation is insufficient' to support a verdict." *Al–Zubaidi v. Ijaz*, 917 F.2d 1347, 1348 (4th Cir.1990),

*cert. denied,* 499 U.S. 960, 111 S.Ct. 1583, 113 L.Ed.2d 648 (1991).

■ We are of opinion that the district court was correct in granting j.n.o.v. in favor of Celanese because the evidence establishes, as a matter of law, what has become known as the "sophisticated user" defense. The Maryland courts adopted the sophisticated user defense in *Kennedy v. Mobay Corp.,* 325 Md. 385, 601 A.2d 123 (1992), *aff'g for the reasons stated in* 84 Md.App. 397, 579 A.2d 1191 (1990). The defense is based upon the principles set forth in Restatement (Second) of Torts § 388,[1] and, as adopted in Maryland, upon the articulation of the defense and the principles underlying it appearing in *Goodbar v. Whitehead Bros.,* 591 F.Supp. 552 (W.D.Va.1984), *aff'd sub nom. on the opinion of the district court, Beale v. Hardy,* 769 F.2d 213 (4th Cir.1985). See *Kennedy v. Mobay Corp.,* 579 A.2d at 1194.

The sophisticated user defense is implicated in the situation in which A supplies a chattel to B, B in turn allows C to be exposed to the chattel, C is injured by exposure to the chattel, and C claims that A should be liable to C for A's failure to warn C of the danger. In *Kennedy,* the Maryland Court of Special Appeals quoted the following from *Goodbar:*

> [I]n alleged negligent failure to warn situations such as this litigation, if the danger related to the particular product is clearly known to the purchaser/employer, then there will be no obligation to warn placed upon the supplier. Instead, it becomes the employer's responsibility to guard against the known danger by either warning its employees or otherwise providing the necessary protection. Stated another way, when the supplier has reason to believe that the purchaser of the product will recognize the danger associated with the product, no warnings are mandated.

*Kennedy,* 579 A.2d at 1196, *quoting Goodbar,* 591 F.Supp. at 560–61. The *Kennedy* court applied the defense in a strict liability action, and implied that the defense also would apply to cases based on a negligent failure to warn and breach of implied warranty. *Kennedy,* 579 A.2d at 1198–99.

The sophisticated user defense, as adopted in Maryland, was summarized in *Kennedy* as follows:

> Part of the problem that may lead some to look askance at this defense is in the language that some courts have used to describe it, in particular the notion that where the elements or prerequisites of it exist, the supplier is "absolved" of any duty to warn ultimate users. That notion is not only unnecessary to the defense but in fact is inconsistent with the rationale of comment n to Restatement § 388. There *is* a duty to warn of defects or propensities that make a product hazardous, and that duty *does* extend ordinarily to those who may reasonably be expected to use or come into harmful contact with the product. It is *not* a duty, we think, from which the supplier can be entirely *absolved.* The question, rather, is, what conduct will suffice to discharge that duty?
>
> Viewed in that context, the defense is not only logical but necessary. Where it is impracticable for the supplier to give adequate warnings directly to all who may use or come into contact with the product, some substitute for such direct warnings is required, even in strict liability cases. Otherwise, as Messrs. Schwartz and Driver observed, *supra,* strict liability would become in effect, absolute liability. As comment n to Restatement § 388 makes clear, the focus remains on the conduct of the supplier, but that conduct is judged in light of the circumstances. Among those circumstances are the feasibility of giving

---

1. The text of § 388 provides:

    One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

    (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

    Restatement (Second) of Torts § 388.

direct warnings to all who are entitled to them and, where that is not feasible, whether the supplier acted in a manner reasonably calculated to assure either that the necessary information would be passed on to the ultimate handlers of the product or that their safety would otherwise be attended to. In such a situation, that is all that reasonably can be asked and it is all we think, that the law requires.

*Kennedy*, 579 A.2d at 1191 (emphasis in original). The defense is available not only when the supplier actually warned the intermediary, but also when the supplier shows that it was reasonable to believe that a warning was unnecessary because the intermediary was already well aware of the danger. *Eagle–Picher Indus., Inc. v. Balbos*, 326 Md. 179, 604 A.2d 445, 465 (1992).

Several factors must be considered in determining whether the supplier reasonably relied upon the intermediary to warn users:
(1) the dangerous condition of the product; (2) the purpose for which the product is used; (3) the form of any warnings given; (4) the reliability for the third party as a conduit of necessary information about the product; (5) the magnitude of the risk involved; and (6) the burdens imposed on the supplier by requiring that he directly warn all users.

*Eagle–Picher*, 604 A.2d at 464.

We are of opinion that, viewing the evidence in the light most favorable to the plaintiffs and drawing all legitimate inferences in their favor, there is no legally sufficient evidentiary basis for a reasonable jury to have found that the sophisticated user defense had not been established by Celanese.

First, we should be clear in defining "the dangerous condition of the product" and "the purpose for which the product was to be used," the first and second of the six factors to be considered in determining whether the supplier reasonably relied on the intermediary to warn users. The ultimate risk was not the mere existence of lead-based paint on the spinning machines. Rather, it was the inhalation of fumes from burning lead paint in concentrations high enough to cause health problems. This risk was the combination of three factors: the existence of lead-based paint on the interior of the spinning machines; the use of a cutting torch to dismantle the areas of the machines coated with the lead-based paint; and the failure to wear a proper respirator or to provide adequate ventilation.

Celanese did not contend that it was unaware, as a corporate entity, that there was lead-based paint on the interior of the spinning machines. And there is no evidence that Celanese had any knowledge about whether Trans America would or would not provide respirators to its employees. In fact, Trans America never told Celanese exactly how to go about the removal of the equipment. This aspect of the salvage operation was left up to Trans America, to be determined based on its expertise in salvage operations of this type.

Second, a reasonable jury necessarily would have found it reasonable for Celanese to believe that, as an experienced salvage company, Trans America would recognize certain obvious hazards connected with a salvage operation, including the possibility that the red-orange colored substance might be red lead, and that Trans America would take reasonable precautions to ensure the safety of its employees. As required by *Eagle–Picher*, the evidence shows that Celanese had ample reason to believe that Trans America had extensive knowledge concerning the risks associated with a salvage operation of this type. The president of Trans America, James H. Griggs, made several trips to the Amcelle plant for inspections prior to bidding the job. As president of Trans America, and of another company called Tire Sales Company, Inc., Griggs had been involved in the business of liquidating industrial plants for 15 to 20 years. In addition, Trans America had previously dismantled a Celanese plant in Georgia, and had experience in handling hazardous chemicals.

Using torches to dismantle equipment is standard procedure in Trans America's business. It is undisputed that when the outer layers were removed in dismantling the distinctive red-orange color of the red lead was plainly visible to Trans America employees, including the plaintiff and the Trans America

supervisor, Charles Cassel. Moreover, there was undisputed[2] testimony from Mr. Kline of MOSH, who was qualified by the trial court as an expert industrial hygienist qualified to testify on the subject of environmental safety and lead exposure in the workplace, that the existence of an orange-colored substance on machines that were the age of the Celanese spinning machines would alert a salvage operator of Trans America's experience to the possibility that the substance may contain lead. Celanese reasonably could only have assumed that, with its extensive experience in using torches to dismantle used industrial equipment, Trans America would take whatever precautions were commonplace in the salvage trade, such as providing respirators to its employees. Such an assumption on the part of Celanese would have been every bit as reasonable as the assumption that it would take other reasonable precautions against dangers that would be obvious to an experienced salvor like Trans America: for example providing welding hoods for its welders or providing safety belts for workers required to work in high areas within the plant. In fact, Trans America actually had respirators on hand that, although not the type recommended by MOSH standards, would have provided a substantial amount of protection against the exposure.

Third, a jury necessarily would have found that Celanese had taken reasonable steps, under the circumstances, to identify and warn Trans America about the presence of those hazardous substances that may have been somewhat unique to the Celanese operation at Amcelle and, therefore, not expected to be obvious to an experienced salvor like Trans America. It should be kept in mind that the sale to Trans America was not limited to a single spinning machine or even a single room full of spinning machines. The contract between Trans America and Celanese provided that Celanese had sold certain listed equipment and fixtures to Trans America in exchange for $321,000 and Trans

America's promise to remove all of the equipment purchased within one year of the agreement. The contract provisions listing the specific equipment to be sold cover six pages, and over 70 line-items, some listing a single piece of equipment, and others covering multiple items. At its peak, the Amcelle plant consisted of 34 buildings occupying an area of just over 300 acres, and encompassing well over two million square feet of floor space.

Celanese actually took substantial precautions to warn Trans America about the hazards that it reasonably could have concluded were unique to the Celanese Amcelle facility. The contract between Celanese and Trans America contains the following provision:

4. *Environmental/Safety*

.    .    .    .    .

Buyer will be responsible for all hazardous material. All material will be disposed of according to the terms of contract and all State, Federal and local laws. Extreme caution is to be used when handling these substances.

.    .    .    .    .

The following are hazardous and or regulated substances which will be found within equipment and piping:

A. Miscellaneous Chemicals

1. Askerel—transformer oil (contains PCB)—PCB is a carcinogen. Handling and disposal of the electrical equipment and Askerel is strictly regulated by EPA and the State of Maryland.

2. Asbestos—airborne fibers are considered a carcinogen. Demolition procedures and disposal are strictly regulated by OSHA and the State of Maryland.

3. Chromates—a corrosion inhibitor in the water systems. The hexavalent chromium must be chemically changed to the trivalent form and precipitated out of solution before disposal. Skin and eye irritants.

---

**2.** Although a Trans America manager, George Roberts, claimed never before or since to have seen red lead on machinery or equipment, as *Kennedy* and *Eagle-Picher* make clear, it is not the specific knowledge of the intermediary that is relevant. Rather, the question is whether the supplier, Celanese, acted reasonably in assuming that the intermediary would recognize the danger and take precautions to protect its employees. *Eagle-Picher*, 604 A.2d at 464 ("Under the Restatement view a court focuses on the conduct of the *supplier* of the dangerous product, not on the conduct of the intermediary.") (emphasis in original); *Kennedy*, 579 A.2d at 1199.

4. Acetone—highly volatile, extremely flammable between concentrations of 2.6% and 2.8% in air. Avoid breathing concentrated fumes (OSHA permissible exposure level is 1000 ppm in air). Use spark resistant tools.

5. Dope—contains 70–80% acetone. Use precautions suitable for acetone.

6. Methylene Chloride—Vapor may cause headaches, nausea, dizziness and eye irritation. Animals exposed to high concentrations experienced changes in liver tissue. OSHA exposure limits 500 ppm. Ventilation should be employed to maintain acceptable exposure limits.

7. Triacetate Dope—CTA (Cellulose Triacetate) melts at about 570° F and will burn if exposed to flame. The combustion products may include carbon monoxide, acetic acid and other toxic gases. Contains Methylene Chloride.

This warning does not purport to be an exhaustive listing of the risks that may be encountered in a large salvage operation of this type. It excludes hundreds of possible risks from those that would be obvious to anyone, such as falling in a hole or being injured by a piece of scrap metal left lying around, which, even though obvious to the layman, would be especially so to an experienced salvor. Certainly burning a surface painted with a substance that has the distinctive red-orange color of red lead in a poorly ventilated area without wearing any type of respirator is an open and obvious hazard apparent to a salvor. Celanese also took steps to see that precautions would be taken by Trans America's employees by providing in the contract that Trans America's "removal of the Equipment must be carried out in a careful and workmanlike manner."

As discussed above, one of the factors to be considered in evaluating a sophisticated user defense is the burden that would be imposed on a supplier by requiring that he directly warn all users. This product, the contents of an entire factory, obviously does not lend itself to the typical warning label. As to the feasibility of warnings when the product is a bulk item, the Maryland Court of Appeals had this to say:

The sophisticated user defense is not exclusively available to bulk suppliers of products. Clearly, however, the manner in which the product is supplied to an intermediary is an important factor to consider when determining whether the defendant reasonably relied on the intermediary to warn ultimate users of the product. For instance, when a supplier ships silica sand to a factory in railroad car quantities, it has been held reasonable for the supplier to rely on the knowledgeable management of the factory to disseminate warnings to workers because the supplier had little practical opportunity to warn. *Goodbar.* On the other hand, if the factory purchased the sand in fifty pound bags that were personally handled by the workers, the balance of factors may favor requiring the supplier to place a warning on the bags.

*Eagle–Picher,* 604 A.2d at 464 (citations omitted). It simply would not have been at all feasible for Celanese to place a warning label on each and every piece of equipment to warn of the possible dangers that may arise in trying to salvage that equipment. To require that Celanese warn Trans America employees of a danger that would exist only if the salvage operation were performed in a specific way and without the use of specific safety equipment, in this case with cutting torches on a particular part of a particular type of machine without the use of a respirator or adequate ventilation, would be to require Celanese to become an expert in the salvage business. Not only that, the removal of the equipment was not under the control of Celanese. We are of opinion that, under the circumstance of this case, such a requirement would far exceed the duty to do what is reasonable.

Based on all of the foregoing, we are of opinion that Celanese established the sophisticated user defense as a matter of law.

II.

■ Not only was the sophisticated user defense proven, proximate cause was not proven, and this was recognized by the district court.

We are of opinion and hold that the below-quoted finding of the district court in granting the judgment notwithstanding the verdict is supported by the record and, although a related defense to the sophisticated user doctrine, the absence of the proof of proximate cause is a separate reason for affirming the judgment of the district court:

> Looking at the entirety of the circumstances, there was no duty on the part of Celanese to warn TAL. TAL had been warned. Did know and was charged with knowledge. The actions of TAL were the sole proximate cause of the injury, if any, to the Plaintiff and there was no causal relationship of the actions of Celanese to the injuries to the Plaintiff. If I did not enter N.O.V., I would grant a new trial in the interest of justice because I would believe that the judgment of the jury in finding liability for only the Defendant Celanese is totally against the weight of the credible evidence in this case. The evidence in this case which is credible demonstrates beyond peradventure that TAL and its supervisors disregarded the warnings from every source and its own obvious knowledge about the hazards which confronted its crews by its course of conduct in connection with the burning which took place in Spinning Room 1. TAL's conduct was wholly and solely the result, and it was in utter disregard of MOSH and utter disregard of its contract obligations and utter disregard of its own employees and in utter disregard of its responsibility towards some of the employees. I would therefore grant a Judgment N.O.V., and in the alternative, for the reason which I have assigned, if the N.O.V. should be set aside on appeal by the Court of Appeals, I would grant a new trial and would retry the matter on the issue of liability.

J.A. 266–67.

The judgment of the district court is accordingly

*AFFIRMED.*