**Paul STOFFEL, Plaintiff,**

v.

**THERMOGAS COMPANY and/or Thermogas Company of Dubuque n/k/a Mapco Petroleum, Inc., and/or Mapco Gas Products, Inc., Mid–America Pipeline Company, a Mapco Company and/or Mapco, Inc., and/or Mapco Gas Products, Inc. and/or Mapco, Inc., and U.S. Water–Heater Co. and/or Bradford–White Corp., Defendants.**

No. Civ. 95–1021 MJM.

United States District Court,
N.D. Iowa,
Eastern Division–Dubuque.

Dec. 11, 1997.

Donald G. Beattie, Edward W. Skinner, Skinner Beattie Wilson, Altoona, IA, for Plaintiff, Paul Stoffel.

Lew Eells, Eells & Sovern Law Offices, Cedar Rapids, IA, Leonard J. Johnson, Morrison & Hecker, LLP, Kansas City, MO, for Defendants, Thermogas Company, Mapco Petroleum, MAPCO, Inc., Mapco Gas Products, Inc. and Mid–America Pipeline Co.

Dale Peddicord, Joseph M. Barron, Peddicord. Wharton Thune Spencer, Des Moines, IA, for Defendants, U.S. Waterheater Co. and Bradford–White Corp.

*Memorandum Opinion and Order on Mid–America Pipeline Company's Motion for Summary Judgment*

MELLOY, Chief Judge.

## I. Introduction

Paul Stoffel's basement exploded in flames as he was trying to start his waterheater, leaving him disabled and disfigured. Stoffel filed this suit under the diversity jurisdiction against a variety of defendants, all of whom Stoffel claims were associated in some way with the waterheater or with the propane gas from which it drew its heat. Stoffel alleges that the various defendants were negligent in failing to warn him of the dangers of odorized ethyl propane and in failing to advise him of the need to install a gas detector in his basement. Stoffel also alleges that the defendants breached an express or implied warranty that the propane gas was safe to use and that he had been properly warned of propane's dangers. Lastly, Stoffel alleges that the defendants are liable to him under a theory of strict liability.

All of the defendants have filed motions for summary judgment, which will be considered individually.

## II. Facts

Propane in its natural state is colorless, odorless, and highly inflammable. It is not undetectable to human senses in its natural state, since, as a simple asphyxiant, it will make a person dizzy after a while. But becoming dizzy is neither a quick nor pleasant way of finding out that propane is present. A spark or match can ignite the propane before a person becomes dizzy.

Because of these safety concerns, propane is hardly ever sold to consumers in its natural state. *See* 49 C.F.R. § 173.315(b)(1). Instead, propane is mixed with a chemical malodorant, usually ethyl mercaptan, that gives propane a distinctive smell and warns of its presence. (As one exhibit puts it, "Propane has a bad smell for a good reason.") People

come to recognize the distinctive odor of odorized propane and avoid doing anything to ignite it.

The use of odor to warn of the presence of propane has flaws, however. Not everyone can smell odorized propane; other smells may crowd out the odor of odorized propane; too much ethyl mercaptan can essentially paralyze the sense of smell; and the odor of the propane may fade before the propane itself dissipates. If any of those things happen, a person who relies on his sense of smell to warn him of propane will believe, wrongly, that no propane is present. Thus misled, he could easily strike a match, igniting the propane and putting himself at physical hazard.

Which is exactly what Paul Stoffel claims happened in this case. Stoffel's roommate, Mitch Patzner, had obtained a 100–gallon tank of propane from his employer, Tschiggfrie Excavating; whether Patzner stole the tank from Tschiggfrie, or took it with Tshiggfrie's permission, is a matter of dispute between the parties. Stolen or not, the tank found its way into Stoffel's basement, where Stoffel decided to hook it up to his water heater. After hooking the tank to the heater, Stoffel found that the heater's pilot light would not come on. Suspecting that air in the line from the tank was to blame, Stoffel unscrewed the line's drip cap and let air (or what he thought was air) flow out of the line for 10 or so seconds before screwing the drip cap back on.

Although Stoffel had not smelled propane when he was purging the line, he assumed some propane had escaped, so he took the precaution of heading upstairs for an hour. (All the defendants argue that Stoffel did smell propane, but all Stoffel has said is that the cap he removed smelled of propane.) After the hour passed, Stoffel went down into the basement. Stoffel sniffed the air for propane, even going so far as to get on his hands and knees to sniff around the tank and the water heater.

Smelling nothing, Stoffel struck a match. The resulting explosion hurled him across the room, leaving him injured and burned and dazed, but not unconscious.

The propane that exploded in Stoffel's basement arrived there in the following manner: Mid–America Pipeline Co. transported the propane in bulk through its pipeline to its facility, where it loaded that propane, still in bulk, into one of MAPCO Petroleum Inc.'s trucks. Mid–America odorized the propane while it was in the MAPCO truck and before the truck left the facility. MAPCO then transported the propane to Thermogas, who filled a 100–gallon tank with it. That tank was then sold to Tschiggfrie, removed by Patzner, and carried down into Stoffel's basement, where it held the propane until Stoffel removed the drip line cap.

Stoffel sued everyone preceding Tschiggfrie in the distribution chain—which is to say, Stoffel sued the pipeline company, the truck shipper, and the retailer. Stoffel also sued Bradford–White Company and U.S. Waterheater Company, who made the water heater to which he had connected the propane tank. (Stoffel also sued MAPCO, Inc., the parent company of Mid–America Pipeline, MAPCO Petroleum, and Thermogas, but this Court dismissed the parent company for lack of personal jurisdiction.) Stoffel argues that someone in this distribution chain, or the maker of the water heater, should have warned him of the failings of odor as a propane warning device. Stoffel also argues that, given those failings, someone should have advised him to buy a gas detector or should have included a gas detector on the tank or water heater. Finally, Stoffel argues that the defendants are strictly liable to him for placing a defective product unreasonably dangerous into the stream of commerce, and alleges a breach of both express and implied warranties.

In its analysis of the various motions for summary judgment, this Court will consider the liability of each defendant in the same order as the propane moved among them, beginning with Mid–America Pipeline Company.

### III. Discussion

#### 1. Failure to Warn

■ Stoffel alleges that Mid–America was negligent in failing to warn him of the shortcomings of odor as a propane safety measure,

a claim that under Iowa law is analyzed through the prism of § 388 of the Restatement (Second) of Torts. Mid–America responds that, as the bulk supplier of gas, it lacked any practicable means of directly warning Stoffel of those shortcomings. After all, Mid–America could not affix a sticker to the propane gas itself, and, since Mid–America did not place any propane into containers that were destined for ultimate users, it had nothing to which it could affix warnings that would reach Stoffel. *Cf. O'Neal v. Celanese Corp.*, 10 F.3d 249, 254 (4th Cir.1993) (noting that product "[does] not lend itself to the typical warning label."); *Seibel v. Symons Corp.*, 221 N.W.2d 50, 57 (N.D.1974) (noting that "red paint, decals, and the like" could have been affixed to product); *Note, Failures to Warn and the Sophisticated User Defense*, 74 Va.L.Rev. 579, 585 n. 29 (1988) ("[S]ome products are manufactured and delivered in a form that makes the placement of a warning on them very difficult."). Since Mid–America itself had no way of warning Stoffel, the most it could do, Mid–America argues, was try to make sure the next person down the distribution chain was properly

warned of the dangers of propane and would pass along those warnings, either to the ultimate user or to the next person in the distribution chain. *See Failures to Warn*, 74 Va. L.Rev. at 580 ("Products liability law can encourage warning of end users [ ] by relying on the chain[ ] [of distribution] and requiring each purchaser to warn the next in line[.]"). Mid–America claims it did this; MAPCO Petroleum, the next person in the chain, acknowledged that it knew the dangers of propane and would pass its knowledge along. Mid–America argues that these precautions satisfied a reasonable standard of care, and thus preclude tort liability.[1]

As a legal matter, Mid–America's argument that it can act reasonably to warn the ultimate user by warning an intermediary is well-taken. As the Fourth Circuit Court of Appeals has explained,

There is a duty to warn of defects or propensities that make a product hazardous, and that duty does extend ordinarily to those who may reasonably be expected to use or come into harmful contact with the product. It is not a duty, we think,

---

1. Mid–America also argues that it is a "common carrier," not a "supplier" of propane, and so Restatement (Second) of Torts § 388, which has been adopted by Iowa courts and which imposes on "suppliers" a duty to warn, *see Stibbs v. MAPCO, Inc.*, 945 F.Supp. 1226 (S.D.Iowa 1996), does not apply to it.

This argument is not well-taken. A "supplier" for purposes of § 388 is defined broadly to include "any person who for any purpose or in any manner gives possession of a chattel for another's use[.]" *Restatement (Second) of Torts*, § 388, comment c. Mid–America argues that it is a "common carrier" who neither manufactured nor "took title" to the propane. But § 388 makes liable any person who transfers *possession* of a chattel to another without giving adequate warning of the dangerous nature of the chattel. A common carrier has possession of that which it transports, and so is within the scope of § 388.

The case relied on by Mid–America, *Saddler v. Alaska Marine Lines, Inc.*, 856 P.2d 784 (Alaska 1993), is not persuasive. The *Saddler* court thought comment c limited § 388 to "lessors, bailors, repairers, donors and lenders," 856 P.2d at 788, but did not discuss that part of comment c, quoted above, which defines "supplier" to mean any person who gives possession of a chattel to another. Moreover, the Alaska court's conclusion seems premised in large part on its belief that "[c]ommon carriers should not be subjected to strict products liability; nor should

they be included within the definition of bulk suppliers." 856 P.2d at 788. To the extent that this is a policy judgment excepting common carriers from the usual principles of tort liability, it is a judgment not shared by the Iowa Supreme Court. *See, e.g., National Steel Service Center, Inc. v. Gibbons*, 319 N.W.2d 269 (Iowa 1982)(common carrier strictly liable for damage done while transporting propane).

In an appropriate case, a common carrier who lacks specialized knowledge of the hazards of a particular chattel might not be subject to liability under § 388. That result would be due, however, to the carrier's actual lack of knowledge about the hazards of the chattel and the judgment that the carrier did not act unreasonably in failing to learn about those hazards. *See Jones v. Coleman Co.*, 39 F.3d 749, 754–55 (7th Cir.1994) (applying Illinois law and holding that § 388 does not apply when supplier's knowledge is equal or inferior to knowledge of end user); *see also* § 388(a) (liability imposed only if supplier "knows or has reason to know" of danger). This is not that case, since Mid–America, a specialized kind of common carrier, had actual knowledge of propane's hazards. *See Defendant Mid–America Pipeline Company's Statement of Material Facts* ..., Doc. # 94, ¶ 6 ("Mid–America mailed each of its shipper/customers a packet of information about the storage, use[,] and handling of propane.").

from which the supplier can be entirely absolved. The question, rather, is what conduct will suffice to discharge that duty? ... Where it is impracticable for the supplier to give adequate warnings directly to all who may use or come into contact with the product, some substitute for such direct warnings is required.... As comment *n* to Restatement § 388 makes clear, the focus remains on the conduct of the supplier, but that conduct is judged in light of the circumstances. Among those circumstances are the feasibility of giving direct warnings to all who are entitled to them and, where that is not feasible, whether the supplier acted in a manner reasonably calculated to assure either that the necessary information would be passed on to the ultimate handlers of the product or that their safety would otherwise be attended to. In such a situation, that is all that reasonably can be asked and it is all we think, [sic] that the law requires.

*O'Neal,* 10 F.3d at 251–52, *quoting Kennedy v. Mobay Corp.,* 325 Md. 385, 601 A.2d 123 (Maryland 1992); *see also Donahue v. Phillips Petroleum Co.,* 866 F.2d 1008, 1012 (8th Cir.1989) ("[A] bulk supplier must provide adequate instructions to the distributor next in line or ascertain that the distributor is informed as to the nature of the product and is in a position to convey the information so that the ultimate consumer is appraised of the dangerous propensity of the product."); *Cotton v. Buckeye Gas Products Co.,* 840 F.2d 935, 939 (D.C.Cir.1988) ("Comment n to § 388 makes clear that a product supplier may satisfy its duty to warn by providing information of the product's dangers to a third person upon whom it can reasonably rely to communicate the information to the product's ultimate users."); *Weekes v. Michigan Chrome & Chemical Co.,* 352 F.2d 603, 607 (6th Cir.1965) ("[D]efendant was required to exercise reasonable care ... to reasonably assure itself that its immediate vendee and distributor was so informed as to be able and likely to transmit ... knowledge of [the product's] dangers."); *In re Brooklyn Navy Yard Asbestos Litigation,* 971 F.2d 831, 838 (2nd Cir.1992) (question is whether "the chain of distribution is such that the duty to warn ultimate users should fall" on someone other than the defendant); *Rivers v. AT & T Technologies, Inc.,* 147 Misc.2d 366, 554 N.Y.S.2d 401, 405 (N.Y.Sup.Ct.1990); *Adams v. Union Carbide Corp.,* 737 F.2d 1453, 1465 (6th Cir.1984) ("[T]he [supplier's] duty to warn may be discharged by providing information of the dangerous propensities of the product to a third person ... upon whom it can reasonably rely to communicate the information to the ultimate users of the product[.]"); *id.,* at 1457 ("[The] [supplier's] duty to warn ... can be discharged by the [supplier's] reasonable reliance on a third party ... to convey the information ... to the ultimate user[.]"); *Smith v. Walter C. Best, Inc.,* 927 F.2d 736, 741 (3rd Cir.1990); *Stuckey v. Northern Propane Gas Co.,* 874 F.2d 1563, 1568 (11th Cir.1989) ("[A] supplier's duty to warn an ultimate consumer can be discharged by a warning given to an intermediary[.]"); *Kealoha v. E.I. DuPont De Nemours & Co., Inc.,* 82 F.3d 894 (9th Cir.1996) (applying Hawaii law); *Jacobs v. E.I. DuPont De Nemours & Co.,* 67 F.3d 1219, 1239 (6th Cir.1995) (applying Tennessee law); *Hunnings v. Texaco, Inc.,* 29 F.3d 1480 (11th Cir.1994) (applying Florida law); *Younger v. Dow Corning Corp.,* 202 Kan. 674, 451 P.2d 177, 184 (1969); *Reed v. Pennwalt Corp.,* 22 Wash.App. 718, 591 P.2d 478 (1979); *Jones v. Hittle Service, Inc.,* 219 Kan. 627, 549 P.2d 1383, 1392–93 (1976); *Mason v. Texaco, Inc.,* 862 F.2d 242 (10th Cir.1988). These cases all hold that a supplier may discharge his duty to warn by warning an intermediary.

■ Iowa courts have reached the same conclusion, applying the rule set forth in the Restatement (Second) of Torts § 388 when considering claims of a supplier's negligent failure to warn. *See Stibbs v. MAPCO, Inc.,* 945 F.Supp. 1226, 1231–32 (S.D.Iowa 1996) (citing cases). The Iowa Supreme Court has frequently indicated its agreement with the principles of § 388, *see, e.g., Henkel v. R and S Bottling Co.,* 323 N.W.2d 185 (Iowa 1982); *Spaur v. Owens–Corning Fiberglas Corp.,* 510 N.W.2d 854 (Iowa 1994), and one form of the "bulk supplier" defense is adopted in comment n to § 388:

In all such cases the question may arise as to whether the person supplying the chat-

tel is exercising reasonable care, which he owes to those who are to use it, by informing the third person through whom the chattel is supplied of its actual character.

. . .

Giving to the third person through whom the chattel is supplied all the information necessary to its safe use is not in all cases sufficient to relieve the supplier from liability. It is merely a means by which this information is to be conveyed to those who are to use the chattel. The question remains whether this method gives a reasonable assurance that the information will reach those whose safety depends upon their having it.

Restatement (Second) of Torts, § 388, comment n; see also Failures to Warn, 74 Va. L.Rev. at 596–604 (describing the Restatement approach to failure to warn claims involving chains of supplier from manufacturers to end users). The Iowa Supreme Court has approved the analysis set forth in comment n, see West v. Broderick & Bascom Rope Co., 197 N.W.2d 202, 211 (Iowa 1972); Stibbs, 945 F.Supp. at 1232, which is the same thing as approving what other courts have called the "bulk supplier" or "sophisticated user" defense. See Failures to Warn, 74 Va.L.Rev. at 579–81.[2] While the Iowa Supreme Court has not explicitly approved the "bulk supplier" defense by name, a point noted by Stoffel in his brief, see Plaintiff's Memorandum in Support of Resistance to all Defendants' Motions for Summary Judgment, Doc. # 116, at 10, this Court concludes that the Iowa Supreme Court has in fact adopted that defense. See Cooley v. Quick Supply Co., 221 N.W.2d 763, 770–72 (Iowa 1974).

■ The remaining question is whether Mid–America took reasonable steps to warn Stoffel, through the agency of intermediaries, of the dangers associated with odorized propane. Stoffel claims that he was inadequately warned in two respects: One, he was not advised of the possibility ·of odor fade, the primary shortcoming of odor as a propane warning device; and Two, he was not advised to install a gas detector in his basement.

It is undisputed that Mid–America did not warn Stoffel to install a gas detector in his basement, so Stoffel's claim that he was not advised of the need to do so cannot be disposed of as a factual matter. It might be disposed of as a legal matter, however, on the ground that advising someone to install an expensive and unreliable gas detector in his basement is not a reasonable response to the shortcomings of odorized propane, or on some other ground.

It appears from the record, however, that Mid–America did warn MAPCO Petroleum, the next person in the distribution chain, of the shortcomings of odorized propane, and in particular of the possibility of odor fade. See Doc. # 99, Exhibit 2 ("Safety Information Bulletin"). The remaining question, then, is whether it was reasonable for Mid–America to rely on MAPCO Petroleum to pass along these warnings.

Judge Vietor in Stibbs, supra, concluded that Mid–America reasonably relied on MAPCO Gas Products, Inc., the equivalent of MAPCO Petroleum in this litigation, to pass along safety warnings about that hazards of odorized propane. As Judge Vietor explained,

---

**2.** Mid–America argues that it owed no duty to Stoffel beyond warning the next person in the distribution chain of the dangerous propensities of propane. This is essentially a rejection of the Restatement approach, which requires the supplier to take reasonable measures to ensure that end users are warned, in favor of what one commentator has called "the common law 'duty' approach," which requires only a warning to an intermediary without concern for whether that warning reaches the end user. Failures to Warn, 74 Va.L.Rev. at 590; id., at 593–96 (criticizing 'duty' approach). Mid–America argues that Judge Vietor adopted the common law duty approach in Stibbs. See Mid–America Pipeline

Company's Reply Brief in Support of its Motion for Summary Judgment, Doc. # 125, at 2 (arguing that Stibbs "absolves Mid–America of any duty to warn in this case."). Mid–America misreads Stibbs. Judge Vietor was clear in Stibbs that the question was whether Mid–America "fail[ed] to exercise reasonable care to inform [users] of [the chattel's] dangerous condition or of the facts which make [the chattel] likely to be dangerous." 945 F.Supp. at 1232 (emphasis in original; quotation and citation omitted). Judge Vietor did not hold that Mid–America had no duty to take reasonable steps to ensure that end users were properly warned; he held instead that Mid–America had taken reasonable steps.

[C]ases may arise in which the factors are such that a court may rule as a matter of law the giving of warning to a [intermediary] alone is, or is not, due care. Mid–America complied with its duty to warn first by obtaining assurances from its customers—the shippers [like MAPCO Petroleum]—that they [were] knowledgeable in odorized and unodorized propane. Second, it also require[d] shippers to provide [ ] retailers with any information and warnings they believe necessary for the proper use of odorized propane. Finally, Mid–America provided its customers with information about the characteristics of odorized propane, and specific to this case, it mailed a packet of information about the characteristics of propane and its safe use and handling (including the possibility of odor fade)[.]

. . .

Accordingly, I conclude that Mid–America complied with its duty to warn[.]

*Stibbs*, 945 F.Supp. at 1232–33.

This Court concurs with Judge Vietor's conclusion in *Stibbs*, and would add only a few comments. As a link in the chain of distribution, MAPCO Petroleum had its own duty under § 388 to warn end users, either directly or through an intermediary, of the dangers of the chattel it was supplying. Of course this duty is contingent upon MAPCO Petroleum's knowing about the dangers of odorized propane. Mid–America, by supplying information about propane's hazards to MAPCO Petroleum, ensured that MAPCO Petroleum "kn[ew] . . . that the [propane] is or is likely to be dangerous," *see Restatement (Second) of Torts* § 388(a), and so made MAPCO Petroleum potentially liable under § 388 if MAPCO Petroleum failed to pass along those warnings. MAPCO Petroleum's potential tort liability is an incentive for it to pass Mid–America's warnings down the chain of distribution, and Mid–America could reasonably rely on MAPCO Petroleum to do so. *Cf. Failures to Warn*, 74 Va.L.Rev. at 595–96.

As noted above, Mid–America never warned Stoffel, through MAPCO Petroleum,

of the need to install a gas detector in his basement, so the question becomes whether Mid–America acted reasonably in not giving that warning. Mid–America argues that it had no "duty" to "provide or warn about the availability of gas detectors," *see* Doc. # 95, at 16, because (1) there is no requirement "to give information concerning available means for amelioration of obvious dangers," *see* Doc. # 95, at 16, and (2) landlords have no common-law duty to provide smoke detectors to tenants.

As to the second reason, this Court sees little relevant similarity between smoke detectors and gas detectors. The cases holding that a landlord has no duty either to install a smoke detector[3] or to warn of its absence so hold in large part because the lack of a smoke detector is a kind of open and obvious problem that a tenant can be expected to notice and correct, if he deems it necessary. *See, e.g., Johnson v. Davis*, 156 Mich.App. 550, 402 N.W.2d 486, 488 (Mich.App.1987) (no tort liability when "the alleged failure of the [defendant] to install smoke detectors [was] not a concealed dangerous condition . . . that the purchaser could not have discovered."). When the lack of a smoke detector is not obvious, some courts have held that landlords may be liable for failing to warn of its absence. *See, e.g., Younger v. United States*, 662 F.2d 580 (9th Cir.1981) (holding that landlord may be liable under latent defect theory when "the absence of a smoke detector . . . was an obscure defect the average person would not discover.").

It is part of the common knowledge of the community that smoke fumes can overcome a person while he sleeps, and that smoke detectors are needed to disturb slumber so a person can act to ensure his safety. *Cf. Hill v. London, Stetelman, & Kirkwood, Inc.*, 906 F.2d 204, 209 (5th Cir.1990) ("[I]t is difficult to envision any apartment dwelling, in which its occupants are expected to sleep, that would not require a smoke alarm in order to minimize fire hazard."). Mid–America has offered nothing to show that the "reduction of odor intensity [of ethyl mercaptan] due to

---

3. Some cases go the other way. *See, e.g., Northern Lights Motel, Inc. v. Sweaney*, 561 P.2d 1176 (Alaska 1977) (failure to install smoke detector relevant to negligence determination).

oxidation or being adsorbed or absorbed," *see* Doc. # 99, Exhibit 2, is part of the common knowledge of the community such that reasonable people would understand the need to have a detector to warn them of propane that their noses could not detect. The considerations informing the smoke detector cases are therefore not applicable to this matter.

■ By contrast, Mid–America's first reason—that it had no duty to advise Stoffel of available means to ameliorate obvious dangers—is persuasive. The Iowa Supreme Court has held that a supplier is not required "to give information concerning available means for amelioration of obvious dangers, even though [the supplier] is aware of these means and that party to whom the chattel is supplied is not." *Nichols v. Westfield Industries, Ltd.,* 380 N.W.2d 392, 401 (Iowa 1985); *see also Crow v. Manitex, Inc.,* 550 N.W.2d 175, 178 (Iowa App.1996) (same). Odor fade is not an "obvious" danger, but Mid–America took reasonable steps, through MAPCO Petroleum, to advise Stoffel of that danger, and there is no reason that the *Nichols* rule should not apply to a danger that has been made obvious by a warning. Accordingly, Stoffel's claim that Mid–America should have advised him of the wisdom of acquiring a gas detector is untenable under Iowa law.

In summary, Mid–America could reasonably rely on MAPCO Petroleum to pass along its product warnings, thereby absolving Mid–America of § 388 liability. Although those warnings did not include the advice to secure a gas detector, Iowa law does not require Mid–America to give any such warning, since Mid–America, acting though MAPCO Petroleum, took reasonable steps to warn Stoffel of the danger that gas detectors are meant to ameliorate. For those reasons, Mid–America's motion for summary judgment on Stoffel's failure to warn claim must be granted.

2. The Remaining Claims: Strict Liability, Breach of an Express Warranty, Breach of an Implied Warranty of Fitness for a Particular Purpose, and Breach of Implied Warranty of Merchantability

Stoffel also asserted claims against Mid–America for strict liability, breach of an express warranty, breach of an implied warranty of fitness for a particular purpose, and breach of an implied warranty of merchantability. Mid–America moved for summary judgment on all of these claims. Stoffel resisted that motion "in its entirety," *see Resistance by Plaintiff to Mid–America Pipeline Company's Motion for Summary Judgment,* Doc. # 105, at 1, but failed to respond to Mid–America's argument that no genuine issues of material fact existed as to the strict liability and breach of express warranty claims and that Mid–America was entitled to a judgment as a matter of law on those claims. Mid–America argues that it is accordingly entitled to summary judgment on the strict liability and breach of express warranty claims. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

■ Mid–America is not entitled to a summary judgment simply because Stoffel did not respond to Mid–America's arguments. *See Canada v. Union Electric Co.,* 135 F.3d 1211 (8th Cir.1997) ("When a motion would be dispositive of the merits of the cause if granted, courts should normally not treat a failure to respond to the motion as conclusive. They should ... proceed to examine those portions of the record properly before them and decide for themselves whether the motion is well taken."). The initial question is whether Mid–America has made an adequate showing that Stoffel's case is fatally wanting, either factually or legally. Mid–America has clearly made that showing with respect to Stoffel's claim for breach of an express warranty. Under Iowa law, an express warranty requires some affirmation of fact or description on the part of the seller. *See* IOWA CODE § 554.2313; *Dailey v. Holiday Distributing Corp.,* 260 Iowa 859, 151 N.W.2d 477 (1967); *Flom v. Stahly,* 569 N.W.2d 135 (1997). Even assuming that Mid–America is a "seller," Stoffel has offered nothing to show that Mid–America made any

affirmations of fact to him. *Cf. Reutzel v. Spartan Chemical Co.*, 903 F.Supp. 1272, 1282–83 (N.D.Iowa 1995) (declining to consider express warranty claim when plaintiff had not offered a "factual predicate" for that claim). Mid–America's motion for summary judgment on the express warranty claim must be granted.

Summary judgment must also be granted on Stoffel's claim for breach of an implied warranty of fitness for a particular purpose. Under Iowa law, an implied warranty of fitness for a particular purpose is "based on a special reliance by the buyer on the seller to provide goods that will perform a specific use envisaged and communicated by the buyer." *Bergquist v. Mackay Engines, Inc.*, 538 N.W.2d 655 (Iowa App.1995), citing *Van Wyk v. Norden Laboratories, Inc.*, 345 N.W.2d 81, 83 (Iowa 1984). Leaving aside the other problems with Stoffel's implied warranty of fitness claim (for example, whether Stoffel is a "buyer," whether Mid–America is a "seller," whether using propane to heat a residential water heater is a "particular purpose," and so on), there is nothing in the record to show that Stoffel communicated to Mid–America his intended use of the propane. Without such a communication, no implied warranty can arise, and summary judgment in Mid–America's favor must be granted.

Summary judgment must also be granted for Mid–America on Stoffel's claim for breach of the implied warranty of merchantability. As Mid–America points out, liability under that warranty is imposed only on "sellers" of a good. A "seller" under Iowa law is "a person who sells or contracts to sell goods." IOWA CODE § 554.2103 (1997). A "sale" is the "passing of title from the seller to the buyer for a price." IOWA CODE § 554.2106 (1997). Since Mid–America never took title to the odorized propane, it never passed title to that propane to any buyer, and so cannot be liable under the implied warranty of merchantability.

Finally, summary judgment in favor of Mid–America must be granted on Stoffel's strict liability claim. Under Iowa law, "[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer[.]" *Restatement (Second) of Torts*, § 402A; *see also Hawkeye–Security Insurance Co. v. Ford Motor Co.*, 174 N.W.2d 672, 684 (Iowa 1970) (adopting principles of § 402A into Iowa law). Unlike a negligence claim, a strict product liability claim focuses attention on the defendant's product, rather than on the defendant's conduct. *See, e.g., McCarthy v. Olin Corp.*, 119 F.3d 148, 170 (2nd Cir.1997) (Calabresi, J., dissenting) ("The primary difference between the two causes of action [of negligence and strict liability] is that a plaintiff may recover in strict products liability without showing that the defendant's *conduct* was wrongful, so long as its *product* was defective."); *see also Aller v. Rodgers Machinery Manufacturing Co.*, 268 N.W.2d 830, 835 (Iowa 1978) ("In strict liability the plaintiff's proof concerns the condition (dangerous) of a product ... [i]n negligence the proof concerns the reasonableness of the manufacturer's conduct in designing and selling the product as he did.").

Strict liability is imposed upon "one who sells" a defective product, *see* § 402A, which might seem to indicate that Mid–America is not subject to strict liability for the same reason that it was not subject to an implied warranty of merchantability: namely, that Mid–America does not "sell" odorized propane. However, the phrase "one who sells" in § 402A has a broader sweep than the phrase "a person who sells" in IOWA CODE § 554.2103. "A person who sells" under § 554.2103 is a person who passes title to goods to another for a price. By contrast, under § 402A, "one who sells" is any person who places a defective product into the stream of commerce, regardless of whether he places that product in the stream by means of a title-passing sale to another or by some other means. Whether the stream of commerce concept extends so far as to include Mid–America, a common carrier that adds a warning to the product it is transporting, need not be resolved by this Court, since Mid–America is estopped from denying that it is a "seller" within the meaning of § 402A.

In *Menschik v. Mid–America Pipeline Co.,* 812 S.W.2d 861 (Mo.App.1991), the Missouri Court of Appeals held that Mid–America was a "seller" of odorized propane within the meaning of § 402A. *See* 812 S.W.2d at 863–64. This holding was necessary to the court's resolution of the case, since "Mid–America [had argued that] it cannot be held strictly liable for plaintiffs' injuries because it was not a 'seller' of the product, but was only a common carrier providing the service of transporting the product." 812 S.W.2d at 863.

■ Stoffel seeks to invoke the doctrine of nonmutual offensive issue preclusion to prevent Mid–America from arguing that it is not a "seller" within the meaning of § 402A. Under the doctrine of nonmutual offensive issue preclusion, when an issue has been litigated and decided in an earlier court proceeding involving the defendant, a plaintiff who was not a party to that earlier proceeding may use that earlier decision to prevent the defendant from relitigating that same issue. *See generally* 18 *Moore's Federal Practice,* § 132.04[2][c][ii]–[iii] (Matthew Bender 3rd Ed.); *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 329, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) ("[O]ffensive use of [issue preclusion] [occurs when] a plaintiff is seeking to estop a defendant from relitigating the issues which the defendant previously litigated and lost against another plaintiff.").

The Supreme Court has approved the use of nonmutual offensive issue preclusion in federal court, *see Parklane,* 439 U.S. at 331, but has vested federal district courts with "broad discretion" to determine whether estoppel is appropriate in a given case. 439 U.S. at 331; *see also Setter v. A.H. Robins*

Co., Inc., 748 F.2d 1328 (8th Cir.1984); *Berger Transfer & Storage v. Central States, Southeast and Southwest Areas Pension Fund,* 85 F.3d 1374, 1377 (8th Cir.1996) ("If application of offensive issue preclusion would be unfair to a defendant, a trial judge should not allow the use of offensive issue preclusion."). Even before determining whether preclusion is appropriate, however, this Court must determine whether preclusion is available under the law of the jurisdiction that rendered the purportedly preclusive judgment—in this case, the law of Missouri. *See Marrese v. American Academy of Surgeons,* 470 U.S. 373, 380, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985); *E.B. Harper & Co., Inc. v. Nortek, Inc.,* 104 F.3d 913, 921 (7th Cir. 1997) ("[W]e look to the preclusion law of Oregon to determine the preclusive effect of an Oregon judgment in federal court."); *cf. Matsushita Elec. Indus. Co., Ltd. v. Epstein,* 516 U.S. 367, 116 S.Ct. 873, 877, 134 L.Ed.2d 6 (1996) ("Federal courts may not employ their own rules ... in determining the effect of state judgments, but must accept the rules chosen by the State from which the judgment is taken.") (citation and internal quotation omitted).[4]

■ Missouri law allows for the use of nonmutual offensive issue preclusion, when such preclusion would not be unfair and when four requirements are met:

> One, the issue decided in the prior adjudication was identical [to] to the issue presented in the present action;
>
> Two, the prior adjudication resulted in a judgment on the merits;
>
> Three, the party against whom [issue preclusion] is asserted was a party or in privi-

---

4. There is a tension between the Eighth Circuit's directive that "a trial judge should not allow the use of offensive issue preclusion" if to do so would be "unfair to a defendant," *see Berger,* 85 F.3d at 1377, and the Supreme Court's insistence that federal courts not "employ their own rules [ ] in determining the effect of state judgments[.]" *Matsushita,* 116 S.Ct. at 877. It is readily conceivable that a state might require that offensive issue preclusion be applied whenever the conditions for its application are met, without further inquiry into whether preclusion is "unfair" in some sense. In such a case, short of a violation of due process, a federal court would seem bound to invoke issue preclusion,

regardless of whether preclusion was "unfair" in that case. *See Matsushita,* 116 S.Ct. at 884–85 (Ginsburg, J, concurring and dissenting). When the preclusive effect of state court judgments is at issue, then, it seems that the *Berger* unfairness inquiry is appropriate only insofar as state law deems it appropriate. Since, in this case, Missouri law makes the unfairness of issue preclusion the "overriding" factor in determining whether preclusion should apply, *see Oates v. Safeco Ins. Co. of America,* 583 S.W.2d 713, 719 (Mo. banc 1979), this Court may consider whether nonmutual offensive issue preclusion would be unfair to Mid–America.

ty with a party to the prior adjudication; and

Four, the party against whom [issue preclusion] is asserted had a full and fair opportunity to litigate the issue in the prior suit.

*Oates v. Safeco Ins. Co. of America,* 583 S.W.2d 713, 719 (Mo. banc 1979); *see also Board of Education of the City of St. Louis v. City of St. Louis,* 879 S.W.2d 530 (Mo. banc 1994).

▆▆ Applying these factors, this Court concludes that Missouri law would accord nonmutual offensive issue preclusive effect to the *Menschik* court's decision that Mid–America is a "seller" within the meaning of § 402A. The issue here—whether Mid–America is a "seller" for § 402A purposes—is identical to the issue presented in the *Menschik* case; that issue was decided on the merits in the *Menschik* case; Mid–America was a party to that case; and Mid–America had a full and fair opportunity to litigate the issue in the *Menschik* case.

Under Missouri law, and under Eighth Circuit precedent, this Court must still determine whether the application of nonmutual offensive issue preclusion against Mid–America is fair. Courts have held that nonmutual offensive issue preclusion is unfair in various circumstances, including when the party against whom preclusion is asserted did not have a full and fair opportunity to litigate the issue, did not have the chance to obtain review of an adverse judgment[5], was not represented by counsel, was not aware of the potential consequences of an adverse decision on the issue, and so on. *See generally Parklane,* 439 U.S. at 330–31 (describing circumstances in which nonmutual offensive issue preclusion might be unfair to a defendant). None of these seem to apply here. Mid–America was represented by counsel; it had the opportunity to present its position to the Missouri court; the Missouri court resolved the matter on the merits after a consider-

ation of Mid–America's position. No unfairness appears in giving preclusive effect to the Missouri judgment, and so this Court will give such effect to that judgment.

Even though Mid–America is estopped from arguing that it is not a "seller" for purposes of § 402A, it still may be free from strict liability under Iowa law by virtue of IOWA CODE § 613.18, which provides mere sellers with immunity from suit based upon strict liability. Section 613.18 provides in pertinent part as follows:

1. A person who is not the assembler, designer, or manufacturer, and who wholesales, retails, distributes, or otherwise sells a product is:

   a. Immune from any suit based upon strict liability in tort or breach of implied warranty of merchantability which arises solely from an alleged defect in the original design or manufacture of the product.

   b. Not liable for damages based upon strict liability in tort or breach of implied warranty of merchantability for the product upon proof that the manufacturer is subject to the jurisdiction of the courts of this state and has not been judicially declared insolvent.

Under this section, a seller who is not also an assembler, designer, or manufacturer is immune from a suit based on strict liability. In order to understand the operation of this section, and its application to this case, an overview of Iowa strict product liability law is required.

As Judge Calabresi explained in *McCarthy,* the plaintiff in a strict product liability case must show that a product has some defect that makes it unreasonably dangerous to the consumer. *See McCarthy,* 119 F.3d at 171 ("[I]n order for strict products liability to apply, there must be a defect, *i.e.,* something wrong with the product, and if nothing is wrong there will be no liability.") (quotation and citation omitted). Iowa law recognizes

---

**5.** Indeed, federal appellate courts routinely vacate lower court judgments that become moot on appeal precisely so that the parties to those judgments will not suffer preclusive effects from a judgment that they could not effectively appeal. *See Commodity Futures Trading Commission v. Board of Trade of the City of Chicago,* 701 F.2d 653, 656–57 (7th Cir.1983) ("The reason for vacating a lower court's decision when the case becomes moot pending appeal is to make sure that a decision of which the losing party was denied appellate review will not have preclusive effect in a subsequent litigation[.]").

two kinds of product "defects" that may subject a seller to strict product liability: One, a defect in design; and Two, a defect in manufacture. *See Hawkeye–Security, supra; see also* J. Vargo, *The Emperor's New Clothes: The American Law Institute Adorns a 'New Cloth' for Section 402A Products Liability Design Defects—A Survey of the States Reveals a Different Weave,* 26 U.Mem.L.Rev. 493, 660 (1996) (discussing Iowa law). The Second Circuit has explained these two defects as follows:

> [A] manufacturing defect . . . results when a mistake in manufacturing renders a product that is ordinarily safe dangerous so that it causes harm[.]
>
> . . .
>
> [A] design defect . . . results when the product as designed is unreasonably dangerous for its intended use[.]

*McCarthy,* 119 F.3d at 154–55.

IOWA CODE § 613.18, by exempting mere sellers from strict products liability, seeks to ensure that only those who have something to do with the design or manufacture of the product are subject to strict liability. An "assembler" may make some mistake in assembling the product; a "designer" may develop an unreasonably dangerous design; and a "manufacturer" may do both. By contrast, a mere wholesaler, retailer, or distributor simply passes the product along to a purchaser, and lacks control over the design and assembly of the product. Section 613.18 represents a judgment by the Iowa legislature that strict liability for design or manufacturing defects should extend only to those who have some responsibility for the design or manufacture of a product.

It follows that the kind of strict liability defect claim that can be brought against a defendant depends upon what responsibility that defendant had for product at issue. If a defendant's only role in bringing the product to market was to assemble the product, only a manufacturing defect claim may be brought. If a defendant's only role was to design the product, only a design defect claim may be brought. If a defendant both designed and manufactured a product, then either a design defect or a manufacturing defect claim, or both, may be brought.

In this case, Stoffel alleges that propane odorized with ethyl mercaptan has a design defect that renders it unreasonably dangerous to the consumer.[6] A design defect strict liability case may be brought only against those who have responsibility for the design of the product. As Mid–America argues, it odorized propane in the manner directed by its shipper customers, like MAPCO Petroleum, which was usually in the manner specified by federal regulations. *See* 49 C.F.R. § 173.315(b)(1) (note 2) ("The use of 1.0 pound of ethyl mercaptan . . . shall be considered to meet the [odorizing] requirements of § 173.315(b)(1)."). Mid–America exercised no independent judgment about the design of odorized propane, and did not choose the design that was used. *See* Doc. # 99, *Exhibit 1* (Affidavit of Steven Breckon), ¶ 9 ("The shippers reserve the right to decide which odorant and how much odorant to inject into the propane."). Mid–America simply added the ethyl mercaptan to the propane. Even assuming that adding the ethyl makes Mid–America an "assembler" of the odorized propane, as an assembler, Mid–America is not subject to a design defect claim. Since Stoffel has not identified any defect in the manufacture or assembly of the odorized propane, he has no strict liability claim against Mid–America. Mid–America's motion for summary judgment on the strict liability claim must be granted.

### III. Conclusion

For the foregoing reasons, Mid–America's motion for summary judgment, Doc. # 93, is GRANTED. There being no just reason for delay, the Clerk is directed to enter a final judgment in favor of Mid–America pursuant

---

**6.** In his complaint, Stoffel simply alleges that odorized propane has a "defect" that makes it unreasonably dangerous to the consumer. It is evident from the record developed in this case, however, that Stoffel does not contend that any-

thing went awry in the manufacture of the propane that exploded in his basement. Stoffel's claim is that using ethyl mercaptan to odorize the propane was a design flaw that rendered the propane unreasonably dangerous.

to Rule 54(b) of the Federal Rules of Civil Procedure.